Josue COLON, an Infant under the age of 14 years by his Mother and Natural Guardian, Iris MOLINA, and Iris Molina, Individually, Plaintiffs,

v.

BIC USA, INC., Defendant.

No. 00 CIV. 3666(SAS).

United States District Court,
S.D. New York.

Dec. 19, 2001.

Barry I. Levy, Beth Shapiro, Shapiro, Beilly, Rosenberg, Aronowitz, Levy & Fox, LLP, New York City, for Plaintiffs.

Anthony F. Tagliagambe, Brian A. Kalman, London Fischer, LLP, New York City, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

In the afternoon of January 2, 1998, then six year-old Josue Colon stole away with his younger brother to play with their

great-aunt's disposable cigarette lighter in the bathroom while she was watching television. Tragically, Josue succeeded in igniting his own shirt, inflicting severe burns on his torso and neck. Josue, an infant under the age of fourteen by his mother, Iris Molina, and Iris Molina, individually, bring this personal injury action against defendant BIC USA, Inc. ("BIC"), based on common law tort theories of negligence, strict products liability and breach of warranty in connection with the design, manufacturing, testing, merchandising, and marketing of a BIC disposable butane lighter. Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332 and venue is proper in this district.

This Court denied BIC's motion to dismiss on preemption grounds, holding that plaintiffs' claims were not expressly or impliedly preempted by the Consumer Product Safety Act, 15 U.S.C. §§ 2051–2084. *See Colon v. BIC*, 136 F.Supp.2d 196 (S.D.N.Y.2000)(*"Colon I "*). Trial is set to begin on January 7, 2002. BIC now moves for summary judgment on the grounds that (1) the lighter that injured Josue was substantially modified after it left BIC's control; (2) there can be no duty to warn when additional warnings would be superfluous under the circumstances; and (3) no genuine issue of material fact exists as to whether Josue removed the lighter's safety feature. Defendant also moves to exclude the testimony of plaintiffs' expert, John Nelson, on the ground that it fails the *Daubert, Kumho Tire* and *Joiner* criteria for admissibility of expert testimony.

Further, defendant moves to dismiss Iris Molina's claims for emotional and psychiatric injuries, as well as for pecuniary support, because she was not within the "zone of danger" and because an award of pecuniary support for the mother would be duplicative of any lost earnings award to Josue. Defendant also moves for separate trials on liability and damages. Finally, defendant brings the following motions in limine: (1) to limit the number of photographs and slides of Josue's injuries; (2) to exclude the videotape of Josue in the hospital; (3) to exclude prior claims and complaints against BIC; and (4) to exclude expert testimony regarding plaintiffs' claim that the lighter's bright color was a design defect.

Plaintiffs bring the following motions in limine: (1) to exclude the testimony of defendant's expert, Lawrence Broutman, because it would be cumulative; (2) to exclude the testimony of defendant's expert, Eric Peterson, because it would be cumulative, irrelevant and amount to improper legal testimony. Plaintiffs move to exclude all evidence of Josue's prior conduct and activity as irrelevant and improper character evidence.

Defendant's motions (1) to dismiss Iris Molina's claims, (2) to bifurcate the trial, and (3) to exclude all reference to color as a design defect are granted. Defendant's motions to limit the number of visual representations of Josue's injuries, and to exclude the hospital videotape, are granted with respect to the liability phase of trial, but denied with respect to the damages phase. The motion to exclude evidence of Josue's prior conduct or activity is granted. Plaintiffs' motion to exclude the testimony of Eric Peterson is granted, but their motion to exclude Lawrence Broutman is denied.

For the reasons set forth below, defendant's motion for summary judgment is granted as to plaintiffs' design defect claims including failure to warn, but denied as to their manufacturing defect claim. Defendant's motion to exclude John Nelson's testimony on alternative designs is granted, but Nelson may testify as both a lay and expert witness regarding

causation in conjunction with plaintiffs' claim for manufacturing defect.

## I. FACTUAL BACKGROUND

### A. The Accident

On January 2, 1998, six-year-old Josue sustained burns to his torso and neck after igniting his shirt with a BIC lighter. *See* Plaintiff's Verified Amended Complaint ("Compl.") ¶ 11. The incident occurred while Josue was staying with his aunt, Brunhilda Rivera, in Worcester, Massachusetts. *See* Defendant's Local Civil Rule 56.1 Statement ("Def.56.1") ¶ 1; Plaintiffs' Response to Defendant's Rule 56.1 Statement ("Pl.56.1") ¶ 1.

Ms. Rivera purchased a red BIC J–15 lighter three days prior to the accident from Santiago's Market in Worcester, Massachusetts. *See* Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2. She describes the lighter that she bought as having a red body, a black locker, and a white warning label that read "Flammable" or "Inflammable." *See* 2/26/01 Deposition of Brunhilda Rivera, Great–Aunt of Josue Colon ("Rivera Dep.") at 16, 55–56. She did not have any other lighters in the house at the time of the accident. *See* Pl. 56.1 ¶ 2; Rivera Dep. at 37–38. Plaintiffs contend that the lighter that the police retrieved several hours after the accident ("subject lighter" or "lighter") is the same lighter that Ms. Rivera purchased three days earlier and that Josue used to injure himself.[1] Pl. 56.1 ¶ 3.

The subject lighter no longer had a child-resistant safety latch (or "locker" or "child guard" or "safety feature") when the police retrieved it. *See* Def. 56.1 ¶ 13; Pl. 56.1 ¶ 13; Photograph of Subject Lighter Placed on 01/02/98 Note Written by Sgt. Mark Richardson ("01/02/98 Police Photograph")(identifying subject lighter and transcribing Ms. Rivera's address), Ex. E to 10/15/01 Declaration of John Nelson, Plaintiffs' Expert ("Nelson Dec."). Both Ms. Rivera and Iris Molina, who was present in the store where Ms. Rivera bought the lighter, recall that the subject lighter was purchased with a child-resistant safety latch attached to it. *See* Rivera Dep. at 16, 57; 1/4/01 Report of John Nelson ("Nelson Rpt.") at 3 (referring to his 12/27/00 interview of Iris Molina). In fact, Ms. Rivera testified that she made sure that she purchased a lighter that was child-resistant. *See* Rivera Dep. at 57. Ms. Rivera testified that she did not let anyone borrow her lighter in the three days between its purchase and the accident, that she did not remove the subject lighter's latch or any part of the lighter prior to the accident, and that she has never removed the "locker" or any part of any lighter in the past. *See id.* at 64, 62, 63–64; Pl. 56.1 ¶ 9. She swears that the child-resistant locker was intact when she last used the lighter at 1:30 p.m. and placed it on the shelf in the living room. *See* Rivera Dep. at 63.

On the day of the accident, Ms. Rivera smoked her last cigarette at 1:30 p.m. and placed the subject lighter on an approximately five foot high shelf in the living room, about six feet from where the two boys were watching television. *See* Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10; Rivera Dep. at 66,

---

1. At trial, BIC plans to assert an identification defense. It contends that the lighter that Josue used was not the J–15 lighter because (1) Ms. Rivera remembers the lighter she bought was clear and pink, whereas the subject lighter is red; (2) the safety feature on the red J–15 lighter is red, whereas both Ms. Rivera and Josue remember the subject lighter's safety feature as black, and (3) the J–15 lighter had a label that read "Keep Away from Children" whereas Ms. Rivera only remembers a label that read "Flammable." Leaving that defense for trial, I assume for the purpose of deciding these motions that the subject lighter was the one that caused Josue's injuries.

35–36 (testifying that she always put her lighter on that shelf). She then sat down to watch television with Josue and his brother, Abdel. *See* Rivera Dep. at 35. Around 3 p.m. Josue and his brother asked permission to use the bathroom. *See id.* at 35, 44. Ms. Rivera agreed. *See id.* at 44. Ms. Rivera believes that either Josue or his brother climbed onto the back of a sofa or armchair to obtain the lighter, and went into the bathroom with it. *See id.* at 66. A few minutes later, Ms. Rivera heard screams coming from the bathroom and came running. *See id.* at 45 ("two or three minutes"), 50 ("a couple of minutes"), 70 ("a few minutes"). She found Josue crying, engulfed in flames from the waist up; she rolled Josue on the kitchen floor and doused him with water to put out the fire. *Id.* at 44, 50, 68.

After calling 911, Ms. Rivera asked the younger brother whether they had used matches to start the fire. *See id.* at 47. According to Ms. Rivera, Abdel responded, "No. He had the lighter." *Id.* (referring to Josue). Ms. Rivera also testified that the younger brother told her that Josue had been "playing with a black thing . . . moving [it], trying topulling that black thing and trying to light it up." *Id.* at 48. Ms. Rivera found the subject lighter on the floor of the bathroom or the kitchen, and tossed it onto the dining room table. *See id.* at 42, 48 (not recalling whether it was the bathroom or kitchen).

Josue testified that the lighter was easy to operate because it did *not* have a "little black thing" attached to it. *See* 3/28/01 Deposition of Josue Colon ("Josue Dep.")

at 35 (referring to the black locker). Josue explained, "it turned on by itself when I switched it, but it didn't have the thing on it," later clarifying "the little black thing. I don't know." *Id.* at 34–35. He did not specify whether he meant that the black locker, or safety feature, was missing at the time he used it or at the time he or his brother took it from the shelf. Josue clarified that he simply pressed the metal part of the lighter with his thumb to ignite it. *See id.* at 36 ("[Q:] What part of the lighter did you touch? [A:] The metal part. When I touched, it went on."). Josue also denied that he had altered the lighter in any way. *See id.* at 35 ("[Q:] From the time you reached for the lighter on the shelf to the time you got to the bathroom, did you do anything to the lighter? [A:] No."). *But see infra* Part III.D.3 (holding that there is a genuine issue of fact as to whether Josue removed the safety feature himself, despite Josue's testimony to the contrary).[2]

The police were the first strangers to arrive on the scene after Ms. Rivera dialed 911. *See* Rivera Dep. at 49 (testifying that three or four officers arrived "a few minutes" after she called 911 and that they arrived before the ambulance). The ambulance arrived shortly thereafter. *See id.* at 49. The police found the subject lighter on the kitchen table (also referred to as the dining room table by Ms. Rivera) and impounded it. *See* 01/03/98 Worcester Police Department Report by Sgt. Mark Richardson ("A pink colored butane lighter was later observed on the kitchen table and is believed to be the lighter used by

---

**2.** The child's unsworn testimony is rife with contradictions and therefore of little evidentiary value. For example, Josue testified that the subject lighter did not have the "black thing" on it, indicating a familiarity with lighters. · *See* Josue Dep. at 34–35. When asked directly afterward whether he had ever seen a lighter before, he answered "No." *Id.*

at 35. At another point, Josue testified several times during his deposition that he "touched the metal part- and [the lighter] turned on by itself." *Id.* at 36, 38. When the deposing attorney asked, "How did you know, Josue, that if you touched the metal part that you would get a flame?," Josue responded, "I didn't know any of that." *Id.* at 38.

Joshua [sic]. It was taken into our possession, along with most of the remains of the charred shirt."); Rivera Dep. at 55 ("[The police officer] took it [the subject lighter] from the table.").

## B. BIC's J–15 Model Lighter

The subject lighter is a BIC J–15 model lighter manufactured with a "Child Guard" safety latch. *See* Rule 26 Report of Paul Labrum, BIC's Director of Corporate Quality ("Labrum Rpt.") at 2 ("The lighter is a J–15 model fixed-flame Child Guard lighter manufactured in Spain during week 28, 1995."). In order to operate the lighter, the user must push the Child Guard latch "in and up" to access the valve actuator. *See* 7/13/94 Letter from BIC to Michael T. Bogumill, Compliance Officer at the Consumer Product Safety Commission ("CPSC") ("7/13/94 Safety Report"), Ex. AA to 8/14/01 Affidavit of Anthony Tagliagambe ("Tagliagambe Aff."), Defendant's Attorney, at 1 (describing operation of the J–15 lighter). The latch otherwise obstructs the downward movement of the actuator. *See id.* With the latch in the "up" position, the user must depress the actuator while rotating the spark wheel with her thumb. *See id.* The valve actuator delivers isobutane gas up to where the wheel generates sparks to ignite the fuel and create a flame. *See id.* Once the latch is released, the Child Guard returns to its closed or latched position. *See id.*

The Child Guard was designed to make it very difficult for young children, who lack fine motor skills and the requisite strength, to operate the lighter. *See* Rule 26 Report of Paul Adams, BIC's Area Manager for Lighter Development ("Adams Rpt.") at 5. For children ulti-mately able to operate the lighter, the purpose of the Child Guard was to delay operation to allow for the possibility that adult supervision would resume. *See id.*

Plaintiffs do not dispute that the lighter, manufactured according to specifications, meets the applicable CPSC standard for child-safety. *See id.* at 3; Labrum Rpt. at 3. The standard requires that at least 85% of children under age five must be unable to override the safety feature. *See* 16 C.F.R. § 1210. Using surrogate lighters which beep rather than ignite, defendant has conducted tests to determine how many children are able to override the feature. *See* Adams Rpt. at 3. Defendant's tests of the J–15 model lighter have shown that 95% of children age five and under are unable to override the Child Guard safety feature. *See* 7/13/94 Letter from BIC to Michael T. Bogumill, Compliance Officer at CPSC ("7/13/94 Safety Report"), Ex. AA to Tagliagambe Aff., at 2 (reporting test results of children using model J–15 surrogate lighter). Over the course of defendant's testing of its enhanced child-resistant lighters, including the J–15 lighter, not one of the 5,000 children under age 5 has been able to completely disable the Child Guard by removing it. *See* Adams Rpt. at 4; 8/29/01 Affidavit of Paul Adams ("Adams Aff.") ¶ 11. Plaintiffs have conducted no tests to show how many children are able to override the feature or whether any children are actually able to remove it. *See* 7/11/01 Deposition of John Nelson, Plaintiffs' Expert ("Nelson Dep.") at 238.[3]

Using various tools, some smokers pry the safety guard from the J–15 model lighter to permit ease of use. One device for prying out the safety feature is the Quick Fix tool. *See* 7/27/01 Deposition of

---

3.

Q: Have you conducted any testing with children for any of the opinions you have rendered in this case? A: No.

Q: Have you ever done any child testing on any product? A: No.
Nelson Dep. at 238.

Paul Adams, Plaintiffs' Expert ("Adams Dep.") at 98–99. BIC is aware of the Quick Fix tool and is otherwise cognizant of the fact that the Child Guard feature aggravates some of its customers, and that many of these customers remove the feature from their lighter. *See id.* at 98–99 (admitting that BIC was aware of the Quick Fix tool, and had in fact purchased some for testing purposes); 1/08/96 BIC Website Posting From "hack" (describing how to "de-childproof" BIC lighters with needle-nose pliers) and an undated BIC Website Posting from "JyNx" (describing how to pry out the "annoying" "little red safety button" from BIC lighters using a pocketknife), Ex. U to Nelson Dec. (the "BIC Website Postings").

Plaintiffs advocate a failsafe lighter design which renders the lighter inoperable when the safety feature "fails" (is removed or broken). *See* 1/4/01 Nelson Rpt. at 8; Nelson Dec. ¶ 22; Plaintiffs' Memorandum in Opposition to BIC's Motion for Summary Judgment ("Pl.Opp'n.") at 14. Defendant knows of no lighter on the market which is rendered inoperable when the safety feature is removed. *See* Adams Rpt. at 4. Further, defendant claims that none of the failsafe mechanisms it has tested are technologically feasible. *See id.*

Defendant claims that every BIC lighter is produced with a peelable white label warning that reads either "Keep Away From Children" or "Keep Out of Reach of Children." Adams Rpt. at 3. *But see* Rivera Dep. at 55–56 (remembering a white sticker that read "Flammable" or "Inflammable"). Apparently, the subject lighter's label warning had been peeled off when the police retrieved it on the day of the accident. *See* 01/02/98 Police Photograph; Labrum Rpt. at 2 (observing that subject lighter was missing its warning label).

## II. DEFENDANT'S *DAUBERT* MOTION TO EXCLUDE EXPERT TESTIMONY

Defendants move to exclude the testimony of plaintiffs' expert, John Nelson.

### A. Legal Standard for Admissibility: Rule 702, *Daubert*

When deciding a motion for summary judgment, a federal district court may consider only admissible evidence. *See Tamarin v. Adam Caterers, Inc.,* 13 F.3d 51, 53 (2d Cir.1993); *Borgognone v. Trump Plaza,* No. 98 Civ. 6139, 2000 WL 341135, at *2 (E.D.N.Y. Mar.9, 2000)("On a summary judgment motion, a district court properly considers only evidence that would be admissible at trial.")(quotation marks and citation omitted). Pursuant to Rule 104(a), the court must evaluate evidence for admissibility before it considers that evidence in ruling on a summary judgment motion. Fed.R.Evid. 104(a) (evaluation of preliminary questions); *see also Borgognone,* 2000 WL 341135, at *2; *Donnelly v. Ford Motor Co.,* 80 F.Supp.2d 45, 47–48 (S.D.N.Y.1999). If a proffer of expert testimony is excluded as inadmissible pursuant to Rule 702, the court must make the summary judgment determination on a record that does not include that evidence. *See Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997); *Donnelly,* 80 F.Supp.2d at 47. The standard for admissibility of evidence pursuant to Rule 702 is the same at the summary judgment stage as it is at trial. *See General Elec. Co. v. Joiner,* 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)("On a motion for summary judgment, disputed issues of fact are resolved against the moving party ... but the question of admissibility of expert testimony is not such an issue of fact.").[4]

---

4. *But see In re Joint Eastern & Southern Dist.* *Asbestos Litig.,* 52 F.3d 1124, 1131 (2d Cir.

██ Federal Rule of Evidence 702 provides

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. The Supreme Court has defined the role of the district court as that of a gatekeeper charged with the task of deciding whether an expert's scientific testimony satisfies Rule 702's general requirements of reliability and relevance. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Originally intended to screen out "junk science," *Daubert* has been extended to apply to both technical and other specialized expert evidence as well. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)(technical or other specialized knowledge); *Brooks v. Outboard Marine Corp.,* 234 F.3d 89, 91 (2d Cir.2000). In December 2000, Rule 702 was amended to incorporate *Daubert's* formulation of the gatekeeping task: the district court must make certain that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. The proponent of the evidence must establish admissibility under Rule 104(a) by a preponderance of the proof. *See Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).[5]

██ The trial judge's gatekeeping task under Rule 702 and *Daubert* is twofold: she must determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786; *United States v. Marji,* 158 F.3d 60, 62 (2d Cir.1998). To assist with the first task of assessing the reliability of expert testimony, *Daubert* provides the district court with four non-exclusive criteria to apply to the expert's reasoning or methodology: (1) whether the expert's concept is capable of being, and has been, tested; (2) whether it has been subjected to peer review; (3) what the known rate of error is; and (4) whether the technique and theory is generally accepted by the scientific community to which it belongs. *See Donnelly,* 80 F.Supp.2d at 47 (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786). Although the focus of the overall inquiry must be on principles and methodology and not on conclusions, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner,* 522 U.S. at 146, 118 S.Ct. 512.

██ Expert engineering testimony may rest on scientific foundations or on the personal knowledge or experience of the

1995) (holding that district court overstepped boundaries set forth in *Daubert* by conflating summary judgment's sufficiency standard with *Daubert*'s threshold admissibility standard).

**5.** In general, a trial court's decision to admit or exclude expert testimony pursuant to *Daubert* is reviewed for abuse of discretion. *See*

*Zuchowicz v. United States,* 140 F.3d 381, 386 (2d Cir.1998) (reviewing *Daubert* decision of lower court to admit or exclude testimony under "highly deferential abuse of discretion standard"); *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1042 (2d Cir.1995) (stating that a decision to admit is not an abuse of discretion unless "manifestly erroneous").

engineer. *See Cacciola v. Selco Balers, Inc.,* 127 F.Supp.2d 175 (E.D.N.Y.2001)(citing *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. 1167). In the latter case, a judge may inquire as to how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the scientific community. *Id.* (citing *Kumho Tire,* 526 U.S. at 151, 119 S.Ct. 1167).

## B. In Limine *Daubert* Hearing

■ Courts often hold pretrial evidentiary hearings pursuant to Rule 104(a) to determine whether expert scientific (or other specialized) testimony is reliable under *Daubert,* regardless of whether the parties have requested such a hearing. Here, the parties have not requested a *Daubert* hearing. Whether to hold a hearing rests within the discretion of this Court. *See* Michael H. Graham, 2 *Handbook of Federal Evidence* § 702.5 (5th ed. 2002)("In light of the Supreme Court's emphasis on the broad discretion granted to trial courts in assessing the relevance and reliability of expert testimony, and in the absence of any authority mandating such a hearing, we conclude that trial courts are not compelled to conduct pretrial hearings in order to discharge the gatekeeping function."); Margaret Berger, "Supreme Court's Trilogy on Admissibility of Expert Testimony," Reference Manual on Scientific Evidence 29 (Fed. Judicial Center 2000)(stating that district courts have discretion). The party proferring testimony is not entitled to a Rule 104(a) hearing. *See Oddi v. Ford Motor Co.,* 234 F.3d 136, 154–55 (3d Cir.2000) (affirming summary judgment granted after excluding expert testimony without holding in limine *Dau-*

*bert* hearing), *cert. denied,* 532 U.S. 921, 121 S.Ct. 1357, 149 L.Ed.2d 287 (2001); *United States v. Alatorre,* 222 F.3d 1098, 1104–05 (9th Cir.2000)(distinguishing *United States v. Velarde,* 214 F.3d 1204, 1209–11 (10th Cir.2000), where the district court failed to conduct *any* reliability determination before excluding evidence); *United States v. Nichols,* 169 F.3d 1255, 1262–63 (10th Cir.1999); *Kirstein v. Parks Corp.,* 159 F.3d 1065, 1067 (7th Cir.1998).

■ The Second Circuit has held that, in general, Rule 104(a) pretrial evidentiary hearings are "highly desirable" because they allow parties to present expert evidence and conduct cross-examination of the proposed expert. *Borawick v. Shay,* 68 F.3d 597, 608 (2d Cir.1995)(nonetheless affirming exclusion of expert testimony despite district court's failure to hold pretrial hearing).[6] Moreover, failure to hold an in limine hearing, especially in the context of summary judgment, may be an abuse of discretion when the ruling on admissibility turns on factual issues. *See, e.g., Padillas v. Stork-Gamco, Inc.,* 186 F.3d 412, 418 (3d Cir.1999); *see also In re TMI Litig.,* 199 F.3d 158, 159 (3d Cir.2000)(stating that in limine hearing is important where exclusion will result in summary judgment, and that magistrate judge abused discretion by excluding evidence without holding in limine hearing); *Ref. Manual on Sci. Evid.* at 29 ("The facts of the case and the consequences of losing the in limine motion will determine the extent of the opportunity the proponent of the expert must be given to present its case."). Not all circuits agree. *See Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 244, 248–49 (6th Cir.2001)(holding that district court not required to hold hearing before excluding evidence pursuant to *Daubert* )(affirming

---

**6.** The Court in *Borawick* discussed but did not apply *Daubert* directly because the issue of whether to admit or exclude the hypnotist was one of competence, not reliability. *Borawick,* 68 F.3d at 610.

summary judgment); *see also Oddi,* 234 F.3d at 151–54 (distinguishing *Padillas* where the record was so scant that the district court could not have evaluated how the expert arrived at his opinions).

Nothing in *Daubert,* or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion. The crux of the parties' dispute over Nelson's testimony is whether, as a matter of law, an engineer's testimony in a design defect case requires the testing of a prototype or existing product to be reliable. *See Padillas,* 186 F.3d at 417 (hearing necessary where court is concerned with the "factual dimensions" of the proposed expert's evidence). Finally, the fact that the evidentiary record is well-developed in this case makes a *Daubert* hearing that much less necessary. *See Oddi,* 234 F.3d at 154 (rejecting plaintiff's argument that in limine *Daubert* hearing was required when court had reviewed well-developed record which included two deposi-

tions, a declaration and an expert report); *see also Nelson,* 243 F.3d at 249 (*Daubert* hearing not required, especially where record was extensive and *Daubert* issue was fully briefed by the parties).[7]

## C. Nelson's Proffered Expert Opinion

John Nelson, the plaintiffs' expert, proffers an expert opinion on two different alleged defects: (1) whether BIC's failure to use failsafe technology in conjunction with the J–15 lighter is unreasonably dangerous and whether there exists a feasible design alternative to the J–15 lighter's child safety feature that would make the product safer, and (2) whether the J–15 lighter's bright color and small size constitutes a defect and whether manufacturing lighters in a dull, matte color is itself a feasible design alternative that would make lighters less attractive to children and therefore safer. Nelson submits a declaration which contains twenty-three (23) exhibits that he relied upon in reaching his expert opinion.[8] *See* Nelson Dec. Nelson summarized his conclusions:

7. Plaintiffs have provided the Court with three different reports or letters from Nelson, a declaration by Nelson which includes a response to BIC's *Daubert* challenge, and Nelson's deposition.

8. The documents that Nelson reviewed and relied upon include: (1) letters to BIC from customers advising that the child-resistant latch could be easily removed and was being removed from the lighter; (2) an article stating that in the design of a child resistant mechanism, manufacturers should be cognizant of the fact that children are persistent in using their teeth, fingers and nails to remove child resistant devices from products; (3) internal reports prepared for BIC which state that brightly-colored, small lighters are attractive to children; (4) an internal memorandum stating that BIC could design child-resistant lighters in dull colors with a matte finish; (5) minutes of a meeting of the ASTM (American Society for Testing of Materials), the fed-

eral regulatory commission prior to the Consumer Product Safety Commission, which alerted manufacturers to the fact that brightly-colored lighters are attractive to children; (6) various other reports and letters recommending that BIC make lighters in dull colors to reduce their attractiveness to children; (7) ASTM minutes which describe the typical scenario of childplay with lighters as involving hiding to avoid adult supervision; (8) a 1988 report by Theta Resources, an engineering consultant, providing design concept illustrations for child resistant mechanisms and advising that lighters should be rendered inoperable when the safety device is detached, that the child safety device should not be detachable, and that color may attract children; (9) internal BIC memoranda from 1987 and 1990 on the topic of lighter design alternatives incorporating failsafe testing and non-attractive colors; (10) documents indicating BIC's awareness that people were removing the child safety latch and that a tool was being

[I]t is my opinion, to a reasonable degree of engineering and scientific certainty, that the BIC J–15 mini-lighter that was involved here was defectively designed, and was unreasonably hazardous for its intended use, because (a) it was not designed and manufactured with reasonable fail-safe technology, which was feasible, and that would have prevented it from operating even if the latch were removed and (b) BIC disregarded the repeated advice of those companies which it had engaged which had stated that color and size of disposable lighters [made the lighters] particularly attractive to children because of these characteristics.

Nelson Dec. ¶ 22. As a threshold matter under Rule 702, the Court must now examine (1) Nelson's qualifications to testify about alternate designs incorporating failsafe technology; and (2) his qualifications to testify about children's color preferences. *See* Fed.R.Evid. 702 (requiring a witness to be "qualified as an expert by knowledge, skill, experience, training or education"). Next, the Court must apply the first prong of the *Daubert* inquiry by evaluating Nelson's methodology or reasoning leading to his conclusions regarding the alleged defects in the J–15 lighter, causation of Josue's injury, alternative designs incorporating failsafe technology and an alternative design based on child color preference. *See Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). As a third and final step in determining whether expert testimony is admissible, courts apply the second prong of *Daubert* which tests any reliable testimony

for fitness, or relevance, to the question(s) at hand.

### D. Nelson's Qualifications

■ As explained below, Nelson is qualified to testify about failsafe technology in disposable butane lighters, but is not qualified to testify about child color preference or lighter designs based on color. Nelson is an engineer who has spent thirty-two (32) years designing, manufacturing and testing gas fuel products, including those which use butane. *See* Nelson Dec. ¶ 5. Butane is the type of fuel used in the lighter in this case. *See id.* Nelson worked as an engineer for Bernzomatic, a manufacturer of fuel gas and related products, for twenty-three years, during which time he "was responsible for the design of more than thirty-five (35) gas fueled and related products, and designed and/or specified details for more than two hundred (200) related components." *Id.* ¶ 6. In addition, Nelson was "personally responsible" for testing many fuel gas products, including "every one of the products" he himself designed for the company. *Id.* ¶ 7. He was also responsible for overseeing testing programs for "an entire line of butane fueled products, which included lighters." *Id.* ¶ 8. Nelson provides an impressive list of fuel gas and butane products that he has designed, tested and/or analyzed over the past three decades, including a propane torch employing fracture groove means technology. *See* Partial Schedule of Fuel Gas and Butane Products Designed, Tested, And/Or Analyzed by John Nelson, Ex. B to Nelson Dec; *see also* Nelson Dec. ¶ 11; *infra* Part II.E.1 (describing Nelson's proposed design involving fracture groove means technology). Nelson has also personally secured patents on three products utilizing

marketed for this purpose. *See* Nelson Dec. ¶¶ 24–25. Nelson also examined ten BIC patents for lighter designs, one of which involved

a piezoelectric mechanism for lighters. *Id.* ¶ 25.

piezoelectric spark ignition for fuel gas camp lanterns. *Id.* ¶ 41; *infra* Part II.E.2 (detailing Nelson's proposed design for a piezoelectric lighter with circuit breaker).

BIC contends that Nelson is not a qualified expert because he has never worked or consulted for a lighter manufacturer, has not taken courses dealing specifically with lighters, and has not previously testified in a lighter case. *See* Defendant's Memorandum of Law in Support of its Motion to Exclude Plaintiff's Expert and for Summary Judgment ("Def.Mem.") at 13. The Court finds no support for this contention.

█ Nelson's extensive background in engineering fuel gas and butane products is sufficient to qualify him as an expert on incorporating childproof or child-resistant failsafe technology into disposable lighters. An expert's training need not narrowly match the point of dispute in the case. *See, e.g., Lappe v. American Honda Motor Co.,* 857 F.Supp. 222, 226 (N.D.N.Y.1994)("Liberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications."), *aff'd,* 101 F.3d 682, 1996 WL 170209 (2d Cir.1996); *McCullock,* 61 F.3d at 1043 (holding that "quibble" over expert's lack of academic qualifications, where expert had "extensive practical experience," went to weight, not admissibility, of expert testimony).

█ On the other hand, plaintiffs have not shown that Nelson is qualified as an expert in any field of study related to child color preferences. Nelson's qualifications regarding childproof and child-resistant technology on lighters does not mean that he is qualified to testify about children's color preferences. The social science of child psychology and color preference differs from the physics of a child's ability to exert enough force to defeat a child-resistant or childproof safety feature. Because I conclude that Nelson is not qualified to testify about child color preferences, I need not discuss in detail the reliability of his testimony on this subject.[9]

9. Even if Nelson were qualified to testify on child color preferences, I would exclude his testimony because it is unreliable. Nelson opines that the color and size of the J–15 mini-lighter attract children, rendering the product unreasonably dangerous. This opinion is based on BIC reports, *see infra* Part IV.D.1 (detailing plaintiffs' evidence), that do not contain data or any other empirical evidence that a child's preference for bright colors increases the likelihood that a child will play with lighters or increases the likelihood of accidents involving lighters. While trained experts may extrapolate from existing data, *see Joiner,* 522 U.S. at 146, 118 S.Ct. 512, they must base their opinions on a reliable foundation. *See Johnson v. Elec. North. Am. Co.,* 103 F.Supp.2d 268, 269 (S.D.N.Y.2000)(excluding testimony because no empirical data on which to extrapolate verifiable assumptions); *Donnelly,* 80 F.Supp.2d at 49–50 (excluding an expert's opinion not based on data, statistics, surveys or comparison studies). Nelson's opinion is derived only from the simple premise that children like bright colors. *See*

*Joiner,* 522 U.S. at 148, 118 S.Ct. 512 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Mink Mart, Inc. v. Reliance Ins. Co.,* 65 F.Supp.2d 176, 180 (S.D.N.Y.1999)(excluding expert opinion as speculative because unconnected to facts at hand). Nelson's opinion is therefore unreliable.

Further, Nelson fails to take into account any countervailing dangers his design alternative, a dull-colored, matte-finished lighter, may present. *See Demaree v. Toyota Motor Corp.,* 37 F.Supp.2d 959, 962–966 (W.D.Ky.1999)(excluding expert opinion on design defect case where expert failed to consider countervailing dangers in his design). Nelson fails to consider that bright, neon colors are most often used to indicate risk of danger because such colors contrast with most environments; in fact, dull-colored, matte-finished objects may present a greater hazard if adults, surveying a room for danger to children, fail to spy a dull, matte lighter left

### E. Reliability of Nelson's Opinion on Failsafe Designs for Lighters

#### 1. Nelson's Opinion on Alternative Failsafe Designs

Drawing from ten lighter designs for which BIC obtained patents as well as his own practical experience, Nelson offers two proposed design alternatives to the J–15 lighter's safety latch. He entitles the first the "Fracture Groove Means Design Concept" (hereinafter "Fracture Concept"). Nelson Dec. ¶¶ 35–37. This proposed design is based on "at least 2 of the" patents, although Nelson does not specify which patents he is referencing. *Id.* ¶ 35. Nelson does not define "fracture groove means" but offers that they are "readily used in the design of products and are incorporated almost exclusively for safety reasons." *Id.* ¶ 37. Apparently, "fracture groove means" refers to a built-in weakness in the plastic or other material. Nelson's Fracture Concept entails using fracture groove means to make a "simple modification" to the J–15's existing locking latch (child safety feature), which would make the locking latch break in two if anyone tried to remove it. *Id.* Even broken in two, the locking latch would be "functionally intact" because parts of it would be left within the body of the light-er, "continuing to prevent depression of the valve actuator." *Id.*[10] Nelson declares that his design is failsafe,[11] but later contradicts himself by stating that this design will render "a child's ability to operate the lighter [ ] extremely difficult because it would likely require . . . a level of skill and dexterity not normally found in young children," thus indicating that the lighter is not failsafe. *Id.* ¶ 37. The J–7 BIC model lighter used a version of the fracture groove technology advocated by Nelson but it was not failsafe because many adults were able to remove the entire piece of plastic constituting the safety feature. *See* Adams Dep. at 74. Nelson has not tested his design to show that it can be built, has provided no drawing of the design, and has not addressed BIC's test results showing that adults were often able to remove the entire safety feature with certain tools— thus nullifying the failsafe feature of the Fracture Concept.

Nelson refers to the second proposed design as "Use of a Piezoelectric Switch and Conductive Locking Latch." *Id.* ¶ 38. This design incorporates "failsafe technology into the design of the J–15 mini-lighter through the use of a piezoelectric switch." *Id.* Nelson states that this design is based on several BIC patents: 5,445,518; 5,092,-

---

out on a table or other dark or neutrally-shaded furniture.

Moreover, Nelson's failure to take into account other causes of children's attraction to lighters—for example interest in fire or a desire to imitate the adults around them—is also a ground for *Daubert* exclusion. *See Wheat v. Pfizer*, 31 F.3d 340 (5th Cir.1994)(rejecting expert testimony where expert could not rule out other possible causes).

10. The "valve" is the component part that delivers the butane fuel to be ignited; the "valve actuator" is the small lever that the user depresses with her thumb to draw up the fuel to be ignited, while striking the wheel to ignite the fuel. *See generally id.* ¶¶ 14–15 (describing the operation of the J–15 lighter).

11. "I have concluded after looking at BIC's patents that by making a simple modification to the locking latch (used in at least 2 of the designs) so as to incorporate fracture groove means, the lighter would then incorporate a form of failsafe technology." Nelson Dec. ¶ 35 (referring to the "Fracture Groove Means Design Concept."). Indeed, the thrust of his testimony is to prove that the J–15 lighter is unreasonably dangerous because it is not failsafe, and that a failsafe design is feasible. Failsafe in the context of lighters means that the lighter will not operate when the safety latch is missing, broken or disabled.

764; and 5,584,682, as well as Nelson's "review and consideration of generally accepted engineering [principles]." *Id.* Nelson describes a piezoelectric lighter as one that looks like a spark wheel lighter, but while the latter generates sparks from flint to ignite fuel, the piezoelectric lighter uses a crystal "to generate voltage to produce spark[s]." *Id.* BIC has developed lighters utilizing piezoelectricity. *See* Adams Dep. at 71. Nelson proposes modifying BIC's patented design by incorporating a locking latch to act as a circuit breaker to cut off the piezoelectricity, as well as to obstruct the gas flow. *See* Nelson Dec. ¶ 38. Nelson hypothesizes that if the latch were removed, it would open the electrical circuit and the lighter would no longer be able to produce a spark to light the butane.[12] *See id.* Once again, he has not provided a design, prototpye, or test results of his proposed design.

## 2. Reliability of Nelson's Opinion on Alternative Failsafe Designs

■■■■ I turn now to an evaluation of Nelson's proffered opinion in light of the *Daubert* factors. *Daubert* is to be applied flexibly. *See Kumho Tire*, 526 U.S. at 149, 119 S.Ct. 1167 (*Daubert* factors not to be considered "a definitive checklist or test"). "A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." *Travelers Property Cas. Co. v. General Elec. Co.*, 150 F.Supp.2d 360, 363 (D.Conn. 2001). Certainly, the district court's role as a gatekeeper in screening out unreliable testimony is "tempered by the liberal thrust of the Federal Rules of Evidence and the presumption of admissibility." *Borawick*, 68 F.3d at 610; *Bunt v. Altec Indus., Inc.*, 962 F.Supp. 313, 317

(N.D.N.Y.1997)(citing *Borawick* ); *Liriano v. Hobart Corp.*, 949 F.Supp. 171, 176 (S.D.N.Y.1996)(same). *Daubert* is not intended to replace the adversary system. *See* Fed.R.Evid. 702 Committee Note. Further, the Second Circuit espouses a particularly broad standard for the admissibility of expert testimony. *See, e.g., Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996)(holding that testimony is to be admitted unless purely conjectural or based on totally unfounded assumptions). As discussed below, Nelson's testimony fails to meet the test for reliability outlined in *Daubert*, and for the most part, does not satisfy the other factors that have grown out of *Daubert* and its progeny.

### a. Testing

■■■■ In analyzing the reliability of an expert's testimony, the "key question" is "whether it can be (and has been) tested." *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786 (alteration in original). Solid qualifications are not enough. *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991–92 (5th Cir.1997)(excluding testimony of qualified expert who failed to conduct tests); *Clark v. Takata*, 192 F.3d 750, 758 (7th Cir.1999) (excluding testimony of highly qualified expert who failed to conduct tests); *Cummins v. Lyle Indus.*, 93 F.3d 362 (7th Cir.1996)("Guesswork, even educated hunches by qualified experts, is not enough. The evidence must be genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."). While conjecture by a qualified expert is worthy of careful attention, the courtroom is "not the place for scientific guesswork, even of the inspired sort." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 319

**12.** Defendant's expert contends that because piezoelectricity arcs, a lighter equipped with a piezoelectric patch would create a flame even with the latch or proposed "conductive strip" removed. *See* Adams Dep. at 71. Nelson does not address this contention.

(7th Cir.1996). The axiom that "[l]aw lags science [but] does not lead it," *id.* at 319, applies equally to proposed engineering innovations in a design defect case. "[A]lternative designs by definition include elements of science, technology and methodology." *Milanowicz v. Raymond Corp.*, 148 F.Supp.2d 525, 532 (D.N.J.2001)(quotation omitted).

■ While testing is not an "absolute prerequisite" for an expert's theory of causation or alternative design to be admissible in a design defect case, it is usually critical to show that an expert "adhere[d] to the same standards of intellectual rigor that are demanded in their professional work." *Cummins*, 93 F.3d at 369. Adherence to engineering standards of intellectual rigor almost always requires testing of a hypothesis if the expert cannot point to an existing design in the marketplace.[13] *See, e.g., Brooks*, 234 F.3d at 92 (rejecting proposed alternative design of kill switch); *Oddi*, 234 F.3d at 156–57 (excluding proffered alternative designs of biomechanical engineer where engineer had not tested either design for a safer bumper on a truck); *Watkins*, 121 F.3d 984 at 988 (rejecting proposed alternative design because alleged expert made no design drawings and conducted no tests of proposed alternatives)[14]; *Cummins*, 93 F.3d at 366 (excluding proposed alternative design of

industrial trim press because expert had never tested his designs nor read any studies of such tests); *Pestel v. Vermeer Mfg. Co.*, 64 F.3d at 384 (8th Cir.1995) (rejecting expert's proposed alternative design because not tested); *Freitas v. Michelin Tire Corp.*, No. 94 Civ. 1812, 2000 WL 424187, at *2 (D.Conn. Mar. 2, 2000)(admitting engineer's expert opinion on alternative design in burst tire case where engineer had conducted numerous burst tests on tires, and reviewed burst tests performed by other experts); *Jarvis v. Ford Motor Co.*, No. 92 Civ. 2900, 1999 WL 461813, at *4 (S.D.N.Y. July 6, 1999)(admitting expert's testimony in design defect case where expert's theory of causation had been "sufficiently verified through repeated tests on a model that accurately reflects the relevant electrical components on the 1991 Ford Aerostar."); *Stanczyk v. Black & Decker, Inc.*, 836 F.Supp. 565 (N.D.Ill.1993) (rejecting expert's proposed alternative design of a guard for allegedly defective saw because no testable design of concept). *But see Colombo v. CMI Corp.*, 26 F.Supp.2d 574 (W.D.N.Y.1998) (admitting testimony of engineering expert because expert need not develop and test a prototype nor provide drawings of alternative design); *Surace v. Caterpillar, Inc.*, No. 94 Civ. 1422, 1995 WL 303895, at *2 (E.D.Pa. May 16, 1995)(admitting testimony of engineering

13. *Daubert* was decided in the context of a complex medical and scientific theory of causation in a toxic tort case. "Methodology" in cases of that sort refers to the scientific method: formulating and testing a hypothesis, conducting experiments, devising and employing controls, generating data, reasoning from the data to derive conclusions. The scientific method in a design defect case is the same: formulating a hypothesis that the design was defective because it lacked a certain feature or configuration which would have averted the accident. It is this hypothesis that must be tested in a design defect case. *Kumho Tire* extended *Daubert*'s holding to all

fields of technical or specialized knowledge. *Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167 ("all expert testimony"). Here, as in most design defect cases, the theory of causation and the alternative design is one and the same—*i.e.* if the lighter had been designed with the proposed failsafe technology, the lighter would not have operated and Josue would not have been harmed.

14. The court in *Watkins* also held that the engineer was unqualified as an expert to testify about the issues in that case. *See Watkins*, 121 F.3d at 988.

expert after concluding that engineer need not have tested his theory regarding defective warnings).[15] The presence of this factor in a design defect case also ensures that the focus of the jury's deliberation is on whether the manufacturer could have designed a safer product, not on whether an expert's proposed but untested hypothesis might bear fruit.

The Second Circuit's most recent discussion of testing in a design defect case took place in *Brooks*, which involved a teenager whose hand was amputated by an uncovered motor on a motor boat. *Brooks*, 234 F.3d at 90. The boy's father sued the manufacturer of the boat, alleging design defect. *See id.* At issue in *Brooks* was the admissibility of plaintiff's expert, Mr. Warren, who proffered the opinion that either of his proposed alternative designs, a propeller guard or a kill switch, would have averted the accident. *See id.* at 91. The district court, noting that Mr. Warren had not conducted "any actual testing to determine whether the use of a lanyard-activated kill switch would have disengaged the engine under the circumstances," excluded his testimony as unreliable. *Id.* (citing 47 F.Supp.2d 380, 388 (W.D.N.Y.1999)(adopting magistrate's recommendation)).

Here, as in *Brooks*, the expert has not developed or tested prototypes of lighters embodying his alternative designs, nor identified any product in the marketplace utilizing those designs.[16] Plaintiffs contend that Nelson was not required to test his hypothesis, protesting that

> [f]rom a practical standpoint, it is simply inconceivable to expect that [sic] a design expert, in the context of a child's personal injury litigation, to develop a working prototype of every design alternative to the product which he would propose.

Nelson Dec. ¶ 33. Nelson rejected the suggestion of Mr. Meltzer, plaintiffs' counsel, that he develop a prototype of his alternative design. *See* Nelson Dep. at 183. Nelson's response to Meltzer was that developing the alternative design "would take considerable time, and [that] there may be a better approach." *Id.* Nelson asserts in his declaration that "[a] working prototype of a disposable butane lighter that incorporates the additional safety features, would, in [his] opinion, cost tens of thousands of dollars to produce in defensible form." Nelson Dec. ¶ 33. A similar argument was rejected in the context of the reliability of an alternative design for a defective saw blade:

15. Both cases predate *Kumho Tire* which extended *Daubert* principles to engineering and other technical or specialized testimony. *Kumho Tire*, 526 U.S. at 147–48, 119 S.Ct. 1167. In *Colombo*, the court admitted the testimony of an expert on alleged design defects in a piece of a road construction equipment called a pavement profiler. *Colombo*, 26 F.Supp.2d at 575. Without providing additional facts beyond the expert's qualifications, the court admitted the testimony, holding that *Daubert* does not apply to technical or other specialized evidence. *See Colombo*, 26 F.Supp.2d at 576. It also declared that *Daubert*'s presumption of admissibility would counsel in favor of admitting the expert's testimony even if *Daubert* factors did apply. *See id.* at 577. To the extent the court in *Colombo*

based its opinion on the fact that *Daubert* did not apply to engineering testimony, it is overruled by *Kumho Tire*. To the extent that it held that an engineer need not provide a design that can and has been tested, this Court respectfully disagrees.

16. It is undisputed that no manufacturer of disposable cigarette lighters sells a lighter with a failsafe mechanism. *See* Adams Rpt. at 4; *see also* Nelson Dep. at 245–46 (admitting that he was not aware of the manufacture of any failsafe lighter and that the only product on the market that approximated his proposed safer designs was the "current BIC lighter").

Plaintiff argues that the net effect of this scrutiny of his expert evidence is to put the claim beyond his financial ability to pursue. He would have to pay his expert witness $20,000 to $40,000 to come up with a design. This is true, but it is the very nature of Rule 702 and *Daubert* that requires these expenditures. Proof of any kind is often expensive to gather.

*Stanczyk,* 836 F.Supp. at 568 (offering words of encouragement in that "[s]cientific reliability and validity in our times is seldom cheap, but at least when once established it can be used again and again at little marginal cost.").

■ Further, Nelson offers no "testable" methodology—one cannot objectively challenge the methodology behind Nelson's brief description of either the Fracture Concept or the Piezoelectric Design.[17] *See* Fed.R.Evid. 702, Committee Note (*Daubert*'s testability factor means ability to "be challenged in some objective sense"). In fact, Nelson's "design" may not even be that. *See Peitzmeier v. Hennessy Indus.,* 97 F.3d 293, 297 (8th Cir.1996)("[R]ough sketches [of proposed safety devices] that have not been adapted into engineering drawings, much less prototypes" do not constitute a "design."). Nor does Nelson offer any test results for his theory that either design would actually disable the lighter if the safety feature was removed. *See Brooks,* 234 F.3d at 92 ("Failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony."). The Court is of course mindful that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [is still] the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. However, cross examination of Nelson as to his methodology in this case, which consists of reviewing and revising BIC's patents while conjecturing that his revisions present feasible and safer alternatives to the current J–15 lighter, would only be a test of his credibility, not of the reliability of his methodology— which is a matter of law to be decided by the court.

### b. General Acceptance

■ There is no general acceptance in the engineering community for a methodology that omits testing of a hypothesis. *See Daubert,* 509 U.S. at 594, 113 S.Ct. 2786 ("General acceptance can yet have a bearing on the inquiry.")(quotation marks omitted); *see also Cacciola,* 127 F.Supp.2d at 175 (evaluating the methodology of an engineering expert under *Daubert* in terms of its general acceptance in the community)(citing *Kumho Tire,* 526 U.S. at 151, 119 S.Ct. 1167). The engineering community emphasizes the importance of testing to ensure even a modicum of reliability:

Testing [a] hypothesis may involve years of work during which the engineers may find themselves faced with new problems of developing new materials and new manufacturing processes to fully and effectively realize the new design ... The engineer's experience will be not unlike that of scientists finding that they must modify their hypothesis as testing it reveals its weaknesses.

---

17. In describing his Fracture Concept, Nelson states that bits of a fracture groove latch would be left behind when a user attempts to break off the latch, and these bits would prevent actuation of the lighter. *See* Nelson Dec. ¶¶ 35–36. Nelson provides neither a diagram nor the results of any test of either of his alternative designs. Further, Nelson does not address BIC's findings that the Fracture Concept, as embodied in its earlier J–7 model, was not reliable. *See* Adams Dep. at 73–74.

Henry Petroski, "Reference Guide on Engineering Practice and Methods," *Reference Manual on Scientific Evidence* 586 (Federal Judicial Center 2000) (explaining that the testing of a design of "less critical and costly products" follows a similar process to that of bridges and buildings).

Implying that Nelson's methodology would satisfy the *Daubert* "general acceptance" factor, plaintiffs argue that Nelson's methodology is reliable because his opinions are "based on" BIC's own patents. Nelson Dec. ¶ 34; Pl. Mem. at 8–9 (also arguing that failsafe technology was "known to" BIC); *see also Clay v. Ford Motor Co.*, 215 F.3d 663 (6th Cir.2000)(admitting expert engineer's opinion which consisted of presenting Ford's own designs considered and rejected by Ford during development of truck).[18] *Clay*, however, is distinguishable. Nelson's opinions are not based on BIC's patents, but on "small" and "minor" "revisions," "modifications" and "adapt[ations]" to them. Nelson Dec. ¶¶ 27, 29, 35. Plaintiffs present no evidence indicating that revising patented designs by conjecture is an accepted engineering method. Indeed, the Federal Judicial Center's Reference Guide on Engineering Practice and Methods states:

> [W]hat might appear to be relatively simple design changes for the better can drastically alter a system's behavior by introducing failure modes not even possible in the original design. Seemingly simple and innocuous design changes can be among the most pernicious.

*Ref. Manual* 602 (explaining that the 1981 Kansas City catastrophe in which 114 people were killed by a skywalk collapse was caused by a minor modification of an existing skywalk design). Thus, plaintiffs cannot show that the methodology underlying Nelson's opinions would be generally accepted in the engineering community.

**c. Peer Review and Error Rate**

Nelson has not written or published any articles describing his theories, and there can be no known error rate where Nelson has not tested a prototype of his design, tested a product in the marketplace that embodies his design, or reviewed test results performed by others on his proposed designs. *See Peitzmeier*, 97 F.3d at 297 (excluding proposed design while noting that because it had not been designed or tested, it could not be subjected to peer review or evaluated for rate of error).

Thus, Nelson's testimony does not satisfy any of the four factors in *Daubert*: testing, peer review, error rate or general acceptance. *See Grdinich v. Bradlees*, 187 F.R.D. 77, 81 (S.D.N.Y.1999) (excluding testimony of expert where "it appear[ed] that none of the *Daubert* factors" indicated that the expert's testimony would be reliable).

**d. Other Factors**

■ Taking their cue from *Daubert* 's non-exclusivity language, courts have added factors to the district court's gatekeeping inquiry. *See, e.g., Elcock v. Kmart Corp.*, 233 F.3d 734, 745–46 (3d Cir. 2000)(the non-judicial uses to which the testimony has been put); *In re Paoli*, 35 F.3d 717, 742 (3d Cir.1994)(existence or

---

**18.** Some courts have stated that an opinion based solely on the defendant's data is not reliable. *See Pestel*, 64 F.3d at 384 (refusing to allow expert to rely on testing done by manufacturer because he had not developed, participated in, nor supervised the testing); *see also* dissenting opinion in *Clay*, 215 F.3d at 676 ("While there is a certain logical appeal to the notion that [plaintiffs' expert] opinion must be reliable if it rests upon data produced by the defendant, the notion does not withstand close consideration.") (Ryan, J., dissenting).

maintenance of standards controlling the expert's experiments and testing); *Cowan v. Treetop Enter.*, 120 F.Supp.2d 672, 682–83 (M.D.Tenn.1999)(the judge's experience and common sense); *Demaree v. Toyota Motor Corp.*, 37 F.Supp.2d 959, 962 (W.D.Ky.1999)(whether countervailing dangers taken into account). Nelson's methodology fails under all of the additional factors but one: he satisfies the factor mentioned in *Elcock* because the basis for his theory has been put to some non-judicial use.[19] While this makes Nelson's testimony more reliable than it would otherwise be, it does not outweigh the fact that the testimony fails all four *Daubert* factors. Because plaintiffs have not satisfied the reliability prong of the *Daubert* test, Nelson's testimony on alternative designs must be excluded.[20]

## III. EVIDENCE ON THE REMOVAL OF THE SAFETY LATCH

### 1. Lay Testimony

■ Plaintiffs proffer Nelson's testimony regarding observations of the subject lighter for marks, scratches, and other signs of force. *See* Nelson Rpt. at 6. Lay testimony is admissible where it is (1) rationally based on the perception of the witness; (2) helpful to an understanding of the witness's testimony or the determination of a fact in issue; and (3) not based on

scientific, technical or other specialized knowledge within the scope of Rule 702. *See* Fed.R.Evid. 701. *First*, Nelson himself observed the subject lighter. *Second*, this testimony would be helpful to the jury to determine whether the latch was forcibly removed. *Third*, and finally, because Nelson's opinion that the safety latch was not forcibly removed is not based on scientific, technical or other specialized knowledge, it is admissible under Rule 701.

### 2. Expert Testimony

■ Plaintiffs also proffer Nelson's testimony on the question of when the safety latch was removed from the lighter. Nelson tested his hypothesis that the safety feature was removed immediately before the accident to rebut defendant's theory that the safety latch had been removed long before Josue obtained it as evidenced by debris that built up in the latch cavity. *See* 5/23/01 Report by Nelson ("5/23/01 Nelson Rpt.") at 2. Nelson performed tests which showed that one or two uses generates quite a bit of flint dust, to support his theory that "the mere presence of flint dust in the latch area cannot possibly lead to a reasonably certain conclusion that the latch was removed early on in use." *See* 7/9/01 Response to Defendant's Experts' Reports ("Nelson's Response") Part F. This testimony is expert testimony because it requires technical or specialized

19. Nelson makes some showing that his proposed design grew in part out of his work as an engineer for Bernzomatic, as opposed to being prepared solely for litigation. Greater scrutiny is to be applied to a litigation opinion. *See Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1317 (9th Cir.1995); *see also Samuel v. Ford Motor Co.*, 96 F.Supp.2d 491 (D.Md.2000) (rejecting rollover avoidance design alternative because "born in litigation" and therefore not reliable). While at Bernzomatic, Nelson designed and tested a propane torch which incorporates fracture groove means, and is still in production today. *See* Nelson Dec. ¶ 37. From 1974 to 1990, Nelson designed, tested, and was awarded,

"three separate patents covering piezoelectric spark ignition for fuel gas camp lanterns and torches." *Id.* ¶ 38. While this cuts in Nelson's favor, I note that Nelson does not present test results of these products, or attempt to analogize the success of fracture groove means in those products to a small, disposable lighter.

20. As noted above, Nelson's proposed testimony on alternative design based on color is also excluded. *See supra* Part II.D (explaining that Nelson is not qualified to testify on this subject); note 9 (explaining that Nelson's color testimony is not reliable).

knowledge as to the operation of disposable lighters, the recognition of flint dust and how it is generated.

To be admissible, Nelson must be qualified as an expert on this issue, and the testimony must be reliable and relevant. Relevant evidence is defined as any evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401.

*First*, Nelson is qualified as an expert on disposable butane lighters. *See supra* Part II.D (detailing Nelson's qualifications). *Second*, Nelson's testimony on the "removability" question is also reliable. While Nelson spent only ten minutes inspecting the subject lighter and used only a 10–power loupe, *see* Nelson Dep. at 163–64, this weakness goes to weight not admissibility. *See Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.[21] For the purposes of determining reliability under *Daubert*, a court assesses an expert's methodology, not his conclusions. *See id.* at 595, 113 S.Ct. 2786. *Third*, Nelson's testimony that the latch was removed immediately before the accident and that the lighter displayed no signs of forcible removal, supports the possibility that the child-resistant feature of the lighter in question was flawed or defective. Thus, Nelson's expert testimony on when the latch was removed is admissible.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Governing Law

The parties do not dispute that this action is governed by New York law.

In a products liability action grounded in diversity, New York applies the law of the victim's or plaintiff's domicile where the state in which the injury occurred has only minimal interest in the litigation. *See Smith v. Bell Sports*, 934 F.Supp. 70 (W.D.N.Y.1996)(interpreting New York conflicts law to apply New Jersey law in products liability action where accident victim and companion were residents of New Jersey, injury occurred in New York, product was manufactured in California, and defendant's principal place of business was in Illinois—because New Jersey had greatest interest in having its residents compensated and New York had minimal interest in seeing a non-domiciliary compensated). Here, Massachusetts has only a minimal interest in seeing that the plaintiffs are compensated, whereas New York has an interest in any recovery by its citizens. *See* Compl. ¶ 1 (plaintiffs reside in, and are presumably citizens of, New York); Rivera Dep. at 19–20 (accident occurred in Massachusetts). Thus New York law applies to plaintiffs' claims.

### B. Standard for Summary Judgment in Federal Court

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of fact is "material" for these purposes if it might affect the outcome of the suit under the governing law, and an issue of fact is "gen-

---

21. Defendant claims that Nelson's testimony on the issue of causation is unreliable because he did not interview Josue. *See* Def. SJ Mot. at 15. I note, however, that the test for reliability is not whether the expert "might have done a better job." *Oddi*, 234 F.3d at 156. Nelson has done enough to allow his testimony to be presented to the jury.

uine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See National Union Fire Ins. Co. v. Stroh Companies,* 265 F.3d 97, 103 (2d Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In assessing the record to determine whether any genuine issue of material fact is in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Repp v. Webber,* 132 F.3d 882, 889 (2d Cir.1997). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505). However, the non-moving party may not "rest upon ... mere allegations or denials." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 452 (2d Cir.1999), *cert. denied,* 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000); *see also Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) ("If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.") (quotation marks, citations, and alterations omitted).

▇▇▇▇ *Daubert* did not alter the traditional sufficiency standard for summary judgment. *See In re Joint Eastern & Southern Dist. Asbestos Litig.,* 52 F.3d at 1131–1133 (reversing grant of summary judgment where district court conflated *Daubert* admissibility requirements with summary judgment "sufficiency" standard by improperly weighing plaintiff's evidence in *Daubert* analysis). "Unlike admissibility assessments, which involve decisions about individual evidence, sufficiency assessments entail a review of the sum total of plaintiff's evidence." *Id.* at 1133.

## C. New York Products Liability Law

### 1. Negligence

▇▇▇▇ To make out a prima facie case for negligence in New York, a plaintiff must show (1) that the manufacturer owed plaintiff a duty to exercise reasonable care; (2) a breach of that duty by failure to use reasonable care so that a product is rendered defective, *i.e.* reasonably certain to be dangerous; (3) that the defect was the proximate cause of the plaintiff's injury; and (4) loss or damage. *See McCarthy v. Olin Corp.,* 119 F.3d 148, 156 (2d Cir. 1997); *Cacciola,* 127 F.Supp.2d at 185. In New York, manufacturers of disposable lighters have a duty of care to children who may use them because such misuse is foreseeable. *See Campbell v. BIC,* 154 Misc.2d 976, 586 N.Y.S.2d 871, 873 (N.Y.Sup.Ct. Fulton Co.1992).

### 2. Strict Liability

▇▇▇▇ "A manufacturer who places into the stream of commerce a defective product which causes injury may be held strictly liable." *Amatulli v. Delhi Const. Corp.,* 77 N.Y.2d 525, 532, 569 N.Y.S.2d 337, 571 N.E.2d 645 (1991). Strict liability in New York requires a showing that (1) a defective product (2) caused plaintiff's injury. *See McCarthy,* 119 F.3d at 154.

### 3. Types of Product Defects

▇▇▇▇ Under New York law and that of most jurisdictions, a plaintiff may allege that a product is defective for any one of the following three reasons: (1) design

defect, (2) a failure to warn, or (3) defect as a result of a manufacturing flaw. *See Sage v. Fairchild–Swearingen Corp.*, 70 N.Y.2d 579, 523 N.Y.S.2d 418, 517 N.E.2d 1304 (1987); *see also McCarthy*, 119 F.3d at 154 (stating that in New York three separate actions exist for product defect: manufacturing defect, warning defect, and design defect); *Fane v. Zimmer*, 927 F.2d 124, 128 (2d Cir.1991).

### a. Design Defect

In a claim for defective design, plaintiff must make a showing that (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury. *See Voss v. Black & Decker Mfrg. Co.*, 59 N.Y.2d 102, 108, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983); *Codling v. Paglia*, 32 N.Y.2d 330, 345 N.Y.S.2d 461, 298 N.E.2d 622 (1973); *Ramirez v. Sears, Roebuck & Co.*, 286 A.D.2d 428, 729 N.Y.S.2d 503, 505–06 (2d Dep't 2001); *Sabater v. Lead Indus. Assoc., Inc.*, 183 Misc.2d 759, 704 N.Y.S.2d 800, 804 (N.Y.Sup.Ct.Bronx.Co. 2000). Courts have noted that, for the purposes of analyzing a design defect claim, the theories of strict liability and negligence are virtually identical. *See Searle v. Suburban Propane Div. of Quantum Chem. Corp.*, 263 A.D.2d 335, 700 N.Y.S.2d 588, 591 (3d Dep't 2000) ("[I]n a

design defect case, there is almost no difference between a prima facie case in negligence and one in strict liability.") (quoting *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995)). Ultimately, the inquiry in a design defect case "requires a fact finder to make a judgment about the manufacturer's judgment" in choosing to design a product in a certain way. *Denny*, 87 N.Y.2d at 258, 639 N.Y.S.2d 250, 662 N.E.2d 730. I will therefore analyze plaintiffs' negligence and strict liability claims for design defect under a single test: The plaintiff bears the burden of presenting evidence that (1) the product as designed posed a substantial likelihood of harm, (2) no feasible alternative existed, and (3) the defective design caused plaintiff's injury. *See Voss*, 59 N.Y.2d at 107–08, 463 N.Y.S.2d 398, 450 N.E.2d 204; *Fane*, 927 F.2d at 128. Generally, a plaintiff must also show that the defect existed at the time the product left the defendant's control.[22]

First, a plaintiff must show that the product, as designed, poses a "substantial likelihood of harm." *Voss*, 59 N.Y.2d at 108, 463 N.Y.S.2d 398, 450 N.E.2d 204.[23]

Second, plaintiffs must show that a safer, feasible design alternative existed at the time of manufacture. *See Fane*, 927 F.2d at 128; *Ruthosky v. John Deere Co.*, 235 A.D.2d 620, 651 N.Y.S.2d

**22.** A manufacturer is not liable when a third party substantially modifies its product by disabling or removing a safety feature or guard, *see Robinson v. Reed–Prentice Div. of Package Mach. Corp.*, 49 N.Y.2d 471, 479, 426 N.Y.S.2d 717, 403 N.E.2d 440 (1980), except where the product is purposefully manufactured so as to permit use without a safety feature. *See Lopez v. Precision Papers, Inc.*, 67 N.Y.2d 871, 873, 501 N.Y.S.2d 798, 492 N.E.2d 1214 (1986); *see also infra* Part IV. D.1 (discussing substantial modification defense).

**23.** This showing is "tempered by the realization that some products, for example knives, must by their very nature be dangerous in order to be functional." *McCarthy*, 119 F.3d at 155 (citing *Robinson*, 49 N.Y.2d at 479, 426 N.Y.S.2d 717, 403 N.E.2d 440). "There must be something wrong with the product, and if nothing is wrong there will be no liability." *Id.*

717, 719 (3rd Dep't 1997) (stating that alternative designs must be "economically and technically feasible" when manufactured). These two prongs, grouped together, are often referred to as the risk-utility balancing test used to determine whether a product is defective or "unreasonably dangerous."[24] *See Anderson v. Hedstrom Corp.*, 76 F.Supp.2d 422, 454 (S.D.N.Y.1999) (citing *Cover v. Cohen*, 61 N.Y.2d 261, 266–67, 473 N.Y.S.2d 378, 461 N.E.2d 864 (1984)) ("available alternatives" must exist such that a reasonable person, balancing the product's risks, cost and utility against the alternative's risk, cost and utility, would conclude that it should not have been marketed). A manufacturer is not an insurer against injury, nor must the product be optimally safe. *See Cover*, 61 N.Y.2d at 272, 473 N.Y.S.2d 378, 461 N.E.2d 864. The ultimate issue is whether the product is reasonably safe, not whether it incorporated the safest possible features. *See id.*

 *Third*, and finally, the plaintiff must show that the defective design was the proximate cause of the plaintiff's injury. *See Robinson*, 49 N.Y.2d at 479, 426 N.Y.S.2d 717, 403 N.E.2d 440; *Burns v. Haines Equip., Inc.*, 284 A.D.2d 922, 726 N.Y.S.2d 516, 519 (4th Dep't 2001). Because an accident may have "more than one proximate cause," the test is whether the defendant's defective or unreasonably dangerous design can be shown to be a "substantial cause" of the injury. *Bush v. Lamb–Grays Co.*, 246 A.D.2d 768, 668 N.Y.S.2d 64, 67 (3d Dep't 1998); *see also*

*Voss*, 59 N.Y.2d at 107, 463 N.Y.S.2d 398, 450 N.E.2d 204 ("substantial factor").

### b. Failure to Warn

 A failure to warn claimant must show (1) that a manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that failure to do so was the proximate cause of harm. Failure to warn claims are identical under strict liability and negligence theories of recovery. *See Anderson*, 76 F.Supp.2d at 439 ("Where liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent."); *see also Denny*, 87 N.Y.2d at 258, 639 N.Y.S.2d 250, 662 N.E.2d 730 ("Failure to warn claim ... couched in terms of strict liability, is indistinguishable from a negligence claim."). Further, New York law has already established that disposable lighter manufacturers have a duty to children to exercise reasonable care. *See Campbell*, 586 N.Y.S.2d at 873. I will therefore analyze plaintiffs' failure to warn claim under a single test: (1) whether the warning or lack of warning constituted a defect (2) that was the proximate cause of the plaintiff's injury.

 New York recognizes two exceptions to a defective warning or failure to warn claim. While allowing a failure to warn claim to go forward, the court in *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 677 N.Y.S.2d 764, 700 N.E.2d 303 (1998), "emphasize[d]" two situations which pre-

---

**24.** The risk-utility balancing test combines the first and second elements into one "unreasonably dangerous" or "defective design" prong: a product is unreasonably dangerous if balancing its risks against its utility, and then comparing that result with a balancing of the risks, utility and cost of an alternative design, would lead a reasonable person to conclude that the product should not have been mar-

keted in its present form. *See Anderson*, 76 F.Supp.2d at 454; *see also Del Cid v. Beloit Corp.*, 901 F.Supp. 539, 545 (E.D.N.Y.1995) (whether a design is unreasonably dangerous depends on a balancing of the "foreseeability and gravity of the harm created by the product with the feasibility of a more safe design.").

clude a duty to warn claim. *Id.* at 241, 677 N.Y.S.2d 764, 700 N.E.2d 303. *First,*

> a safety device built into the integrated final product is often the most ·effective way to communicate that operation of the product without the device is hazardous. Thus, where the injured party was fully aware of the hazard through general knowledge, observation or common sense, or participated in the removal of the safety device whose purpose is obvious, lack of a warning about that danger may well obviate the failure to warn as a legal cause of an injury resulting from that danger.

*Id.* at 241, 677 N.Y.S.2d 764, 700 N.E.2d 303. *Second,* a "limited class of hazards need not be warned of as a matter of law because they are patently dangerous or pose open and obvious risks." *Id.* at 241–42, 677 N.Y.S.2d 764, 700 N.E.2d 303 (noting that this is also called the "open and obvious danger exception"). A more recent case stated the two exceptions in the context of proximate cause: "In duty to warn cases, New York recognizes two circumstances that preclude a finding of proximate cause between warning and accident: obviousness and knowledgeable user." *Hutton v. Globe Hoist Co.,* 158 F.Supp.2d 371, 376 (S.D.N.Y.2001). *Hutton* cites *Liriano* for the proposition that a manufacturer has no duty to warn of an obvious danger that could or should have been recognized as a matter of common sense. *Id.*

 Failure to warn is typically a fact-intensive inquiry for the jury to decide. *See Liriano,* 132 F.3d at 131 (stating that courts have "squarely h[e]ld that it is up to the jury to decide whether the manufacturer has, in fact, a duty to warn") (referring to *Miller v. Anetsberger Bros.,* 124 A.D.2d 1057, 1059, 508 N.Y.S.2d 954 (4th Dept.1986) and *Smith v. Royce W. Day Co.,* 242 A.D.2d 394, 661 N.Y.S.2d 101

(3d Dept.1997))·. A failure-to-warn inquiry focuses on three factors: obviousness of risk from actual use of product, knowledge of the particular user, and proximate cause. *See Liriano,* 92 N.Y.2d at 243, 677 N.Y.S.2d 764, 700 N.E.2d 303. In New York, there is a presumption that a user would have heeded warnings if they had been provided, and that the injury would not have occurred. *See Anderson,* 76 F.Supp.2d at 441. However, this presumption may be rebutted by specific facts showing that the warning would have been futile. *See id.* at 441. As outlined above, a court must deny a failure to warn claim as a matter of law where only one conclusion can be drawn from the established facts. *See Liriano,* 92 N.Y.2d at 242, 677 N.Y.S.2d 764, 700 N.E.2d 303; *see also Hutton,* 158 F.Supp.2d at 376–77 (granting summary judgment for manufacturer under New York duty to warn law because plaintiff failed to raise any question as to either the obviousness of, or the plaintiff's knowledge of, the danger).

### c. Manufacturing Defect or Flaw

 To plead and prove a manufacturing flaw under either negligence or strict liability, the plaintiff must show that a specific product unit was defective as a result of "some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction," and that the defect was the cause of plaintiff's injury. *Caprara v. Chrysler Corp.,* 52 N.Y.2d 114, 129, 436 N.Y.S.2d 251, 417 N.E.2d 545 (1981). In other words, a manufacturing flaw exists when the unit in question deviates in quality and other performance standards from all of the other identical units. *See Perazone v. Sears, Roebuck &· Co.,* 128 A.D.2d 15, 515 N.Y.S.2d 908, 911 (3d Dep't 1987). Strict liability is imposed for a manufacturing flaw or defect that renders the product not reasonably safe and is the proximate

cause of injury. *See Caprara,* 52 N.Y.2d at 128–29, 436 N.Y.S.2d 251, 417 N.E.2d 545. A manufacturer is liable in negligence for injury caused by a defective product if it failed to exercise due care in the production of such product. *See Cacciola,* 127 F.Supp.2d at 185. However, the "decisive issue" in a manufacturing defect case is "the existence of the defect without regard to the care exercised by the manufacturer." *Caprara,* 52 N.Y.2d at 129, 436 N.Y.S.2d 251, 417 N.E.2d 545. Obviously, a showing that the design was unsafe or that there existed some better alternative design, is *not* an element in a case alleging a manufacturing defect. *See id.*

## D. Discussion: Summary Judgment

### 1. Design Defect Claims

Plaintiffs raise three different claims of design defect. They claim that the J–15 model lighter is defective because (a) the lighter operates even when its child-resistant safety feature is removed; (b) children are able to remove the safety feature and (c) the lighter attracts children because of its bright color and small size. To review, the elements of a design defect claim are (1) the design created a substantial likelihood of harm; (2) a feasible design alternative existed at the time of manufacture such that the manufacturer's choice of design was not reasonable; (3) the defective design was a substantial cause of the injury. I will now analyze whether plaintiffs have presented sufficient admissible evidence on each of their design defect claims to raise a material and genuine issue of fact.

### a. The Lighter Remains Operable Despite Removal of Latch

Plaintiffs allege that the design of the J–15 lighter poses a substantial likelihood of harm because it operates even with its safety feature removed. Plaintiffs offer an assortment of evidence to support this proposition: (1) that BIC lighters have harmed or caused the death of many children in the past, *see* 1/4/01 Nelson Rpt. at 4–5 (citing lighter-related child death and injury statistics from 1980–1985), and (2) that BIC was aware that adults were removing safety latches of the J–15 model lighter. *See id.* at 6 (listing three reported incidents of latch removal from 1995–1997; no injuries reported). On the other hand, plaintiffs produce no statistics or reports of child lighter-related injuries since 1994, when BIC was forced to comply with the relevant CPSC safety regulations for child safety.[25] *See* Adams Rpt. at 4. They do not allege that the adults who are removing the safety features are the same adults who have children in the house, or offer any data on the rate at which children play with, or are injured by, compromised BIC lighters.

Nevertheless, common sense dictates the conclusion that there is a substantial likelihood of harm when many consumers remove the Child Guard from their lighters. House guests or babysitters could presumably leave modified lighters lying around even if parents and custodians generally would not. Lighters with the safety feature removed are the equivalent of lighters manufactured without a child-resistant feature.[26] Thus, a reasonable jury could find that the lighter's design is defective because it remains operable even after its child-safety feature is removed, a modification of which BIC is fully aware.

Defendant argues that plaintiffs should be barred as a matter of law

---

25. In 1994, the CPSC mandated the use of child-resistant features on disposable cigarette lighters. *See* 16 C.F.R. § 1210.

26. *See supra* note 25.

from pursuing their claim that the lighter was defective because it continued to operate when its safety feature was removed. Under New York law, it is well-settled that a manufacturer is not responsible for injuries caused by its product where a third party has substantially modified the product after it left the manufacturer's control, and the modification has caused injury. *See Robinson*, 49 N.Y.2d 471, 426 N.Y.S.2d 717, 403 N.E.2d 440. The "responsibility [of a manufacturer] is gauged as of the time the product leaves the manufacturer's hands." *Id.* at 479, 426 N.Y.S.2d 717, 403 N.E.2d 440. *Robinson* is widely cited for the proposition that a manufacturer is under no duty to design a product so that its safety device may not be disabled by those who would consciously bypass it. Prying off, breaking, or otherwise forcibly removing the safety feature on a lighter constitutes substantial modification because it renders the lighter unsafe. *See id.* at 481, 426 N.Y.S.2d 717, 403 N.E.2d 440 (destroying functional utility of a safety feature constitutes substantial modification). Plaintiffs' claim, that BIC should be liable for injuries caused to children after third parties have removed the Child Guard, would therefore be barred by the traditional substantial modification defense set forth in *Robinson*.

 Yet, *Robinson* has been limited in several ways. A manufacturer may be liable where plaintiffs adduce evidence to show that a product was purposefully manufactured to permit use without a safety feature. *See Lopez v. Precision Papers, Inc.*, 67 N.Y.2d 871, 873, 501 N.Y.S.2d 798, 492 N.E.2d 1214 (1986) (holding that substantial modification defense did not bar liability for injury caused when large roll of paper fell from forklift with safety guard removed, where forklift was marketed with attached but removable overhead guard). In addition, a manufacturer may

be liable for failure to warn that a product, as modified, may be dangerous. *See Liriano*, 92 N.Y.2d at 240, 677 N.Y.S.2d 764, 700 N.E.2d 303 (establishing that a duty to warn claim against a manufacturer survives even where substantial modification defense bars liability for design defect).

Here, plaintiffs present some evidence raising a triable issue of fact under *Lopez* as to whether BIC purposefully manufactured the lighter so as to permit use without the Child Guard. *Lopez*, 67 N.Y.2d at 873, 501 N.Y.S.2d 798, 492 N.E.2d 1214 (rejecting substantial modification defense where modified forklift was marketed with attached but removable guard); *Rios v. Rockwell In'tl. Corp.*, 268 A.D.2d 279, 701 N.Y.S.2d 386, 386 (1st Dep't 2000) (following *Lopez* in rejecting modification defense where evidence that safety guard was designed to be easily removed to facilitate periodic press maintenance); *Tuesca v. Rando Mach. Corp.*, 226 A.D.2d 157, 640 N.Y.S.2d 106, 107 (1st Dep't 1996) (citing *Lopez* for rejection of substantial modification defense where safety feature of cotton fiber processor was not permanently affixed to machine but simply attached by two clips); *O'Bara v. Piekos*, 161 A.D.2d 1118, 555 N.Y.S.2d 939, 941 (4th Dep't 1990) (invoking *Lopez* exception to modification defense where manufacturer itself had removed the safety feature at some customers' requests, and removal of safety feature increased productivity). The simple fact is that when the Child Guard is removed, the lighter still operates. In fact, removal of the safety latch enhances the lighter's ease of use, which is the reason many consumers remove the latch. *See O'Bara*, 555 N.Y.S.2d at 941 (*Lopez* exception to modification defense applies where removal of safety feature enhances efficacy of product).

More to the point, *Robinson* and its progeny are not directly applicable to man-

ufacturer liability for injuries caused by household consumer products. A review of the case law following *Robinson* reveals that it is almost without exception applied to industrial machinery, *e.g.*, forklifts and conveyers, or semi-industrial equipment such as meat grinders. *See Rios*, 701 N.Y.S.2d at 386 (injury caused by printing press operated without safety guard); *Tuesca*, 640 N.Y.S.2d at 107 (injury caused by cotton fiber processor with plexiglass safety guard removed); *Darsan v. Guncalito Corp.*, 153 A.D.2d 868, 545 N.Y.S.2d 594, 595–96 (2d Dep't 1989) (injury caused by meat grinder with safety guard removed); *Aviles v. Eagle Picher Corp.*, 167 A.D.2d 495, 562 N.Y.S.2d 167, 168 (2d Dep't 1990) (injury caused by employer's substantial modification of bread conveyer); *O'Bara*, 555 N.Y.S.2d at 941 (injury caused by chain saw where chain brake safety feature had been unbolted); *see also Kromer v. Beazer East, Inc.*, 826 F.Supp. 78, 81 (W.D.N.Y.1993) (injury caused by printing press which had been disabled by tying up safety interlock switch with piece of string). *Robinson* itself involved an industrial bead-making machine with a large hole sawed into its plastic safety guard. *Robinson*, 49 N.Y.2d at 476, 426 N.Y.S.2d 717, 403 N.E.2d 440.

Unlike the household environment where children come into frequent contact with various consumer products, the users in the typical *Robinson* setting are trained adults. Their employers share responsibility for their employees' workplace injuries through statutorily-prescribed vehicles of recovery such as Workers' Compensation. Many widely-used consumer household products have a failsafe feature, for example food processors which do not mince, cut or dice when the top is un-latched. Given New York's well-known public policy of compensating victims of dangerous products, the duty that New York courts have imposed on disposable lighter manufacturers to make their products child-resistant, *see Campbell*, 586 N.Y.S.2d 871, and the recognition in *Lopez* and *Liriano* that manufacturer liability does not always stop at the factory door, I conclude that the New York Court of Appeals would see fit to limit *Robinson* once more. Thus the removal of the safety latch by third parties, a practice well-known to BIC, would not bar plaintiffs' design defect claim if plaintiffs could prove that the product was, on the whole, unreasonably dangerous. *See Cover*, 61 N.Y.2d at 266–67, 473 N.Y.S.2d 378, 461 N.E.2d 864 (requiring a balancing of risk, utility and cost of both current design and available alternatives).

Returning to the three-prong test for a design defect claim, plaintiffs have not adduced sufficient admissible evidence under the second prong to show that there is a safer, feasible design alternative to the J–15 lighter. *See Fane*, 927 F.2d at 128. Relying on the testimony of their expert witness, plaintiffs argue that it would have been feasible for BIC to design the lighter so that the removal of the safety feature rendered the product inoperable. I have already ruled, however, that Nelson's opinion on this point must be excluded because it is unreliable.[27] Plaintiffs do not present other evidence that is sufficient to show the existence of a feasible failsafe design alternative.

Plaintiffs also point to other BIC-patented designs that would not make the lighter failsafe but instead make the Child Guard

---

**27.** In any event, Nelson's testimony is not sufficient on this point: "Either of those designs [I proposed, based on minor modifications of BIC's patented designs,] *probably* would have made the lighter inoperable if the latch were removed as either *probably* would have prevented a spark." Nelson Dec. ¶ 29 (emphasis added).

*more difficult* for adults to destroy or remove. *See* Nelson Dec. ¶¶ 31–32 (emphasis added). Plaintiffs state that the design embodied by BIC Patent U.S. 5,092,764 would have been safer because the child resistant feature in that design locks around the valve and is therefore difficult to remove without destroying the valve. *See id.* ¶ 31. They declare, in addition, that BIC Patent U.S. 5,584,682 contains an improved anti-defeat latch.[28] *See id.*

Courts have denied summary judgment where plaintiff was able to show that the alternative design had actually been built. *See Ruthosky,* 651 N.Y.S.2d at 719 (holding that evidence showing that manufacturer changed design of manure spreader's side shield two years after manufacture of allegedly defective side shield raised triable issue of fact as to whether alternative design was feasible); *Williamson v. Hohl Electro–Mation, Inc.,* 206 A.D.2d 829, 615 N.Y.S.2d 196, 196 (4th Dep't 1994) (holding that material modifications to injury-causing control panel raised issue of fact as to whether alternative design was feasible). Assuming that either patented design is technologically feasible,[29] there is no proof that either of those designs would have averted Josue's accident. Plaintiffs cannot show that Josue removed the latch. *See infra* Part IV.D.1.b (concluding that there is no genuine issue of fact as to whether Josue could have removed a properly manufactured safety latch). Because the two designs would make it harder, but not impossible, for a determined adult to remove the Child Guard, plaintiffs cannot show that either design would have been safer in this case because they cannot

show that either design would have averted Josue's accident or lessened its severity. *See Brooks,* 234 F.3d at 91 (holding that plaintiff must raise issue of fact as to whether alternative design would have averted accident or lessened its severity to survive summary judgment on design defect claim). As a final matter, plaintiffs have produced no evidence as to what either design would cost to produce.

Accordingly, plaintiffs have failed to satisfy their "obligation to present evidence that . . . it was feasible to design the product in a safer manner." *Voss,* 59 N.Y.2d at 108, 463 N.Y.S.2d 398, 450 N.E.2d 204. *See also Fane,* 927 F.2d at 128 (plaintiff bears burden of presenting evidence that product could have been designed to be safer).

Despite the fact that plaintiffs show that the alleged defect was the proximate cause of Josue's injuries, this design defect claim fails as a matter of law: Plaintiffs are unable to present sufficient evidence showing that the J–15 lighter's design is unreasonably dangerous, in light of the fact that there are no feasible design alternatives.

#### b. Children Can Remove the Child–Resistant Latch

 Plaintiffs' second claim for design defect is that the lighter is defective because the safety latch can be removed by children. However, plaintiffs cite no other instances where children have removed the latch. To the contrary, plaintiffs cite evidence showing the extreme lengths that adults must go to in order to remove the

---

**28.** Here, plaintiffs provide no information that either patented design has ever been built.

**29.** *See* 35 U.S.C. § 112, which explains one aspect of the application required to patent an invention.

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to *enable* any person skilled in the art . . . to *make* and use the same.

*Id.* (emphasis added).

latch. *See, e.g.,* BIC Website Postings (customers indicating necessity to use needle-nose pliers or pocketknife to remove Child Guard). Plaintiffs offer as evidence an article describing that children are persistent in using their teeth and fingernails to remove different kinds of packaging. *See* Mary Vere, "Variety of Child–Resistant Closures Available," *Child–Resistant Packaging* 21 (American Society for Testing and Materials 1976); 1/4/01 Nelson Rpt. at 3 (citing Vere article for proposition that "[in 1976] BIC made aware that children are ingenious and persistent in defeating/ attempting to defeat child-resistant closures"). This report is irrelevant to the question of whether a child is capable of removing a safety latch on a lighter. Plaintiffs offer no evidence to contradict defendant's expert Paul Adams who testified that no child, of the 5,000 BIC has tested, has ever been able to remove the safety feature. *See* Adams Rpt. at 4.[30]

Because plaintiffs cannot show that the alleged defect (ability of children to remove the safety latch) created a substantial likelihood of harm, there is no need to discuss the remaining elements of a design defect claim—alternative design and causation. Assessing the plaintiffs' proffered evidence and drawing all reasonable inferences in their favor, no reasonable jury could find that the J–15 lighter is defective because children can remove its safety feature—indeed, it has never happened with a properly manufactured J–15 model lighter.

### c. Bright Color and Small Size Are Child–Attractive

■ Plaintiffs' third claim for design defect is that the lighters are brightly-colored and small, making them attractive to children and therefore unreasonably dangerous. Plaintiffs fail to satisfy the first prong of their claim that this alleged defect created a substantial likelihood of harm. Plaintiffs offer internal and retained consultant reports, as well as a report from a consumer group, suggesting that bright colors are child-attractive and that dull-colored lighters may therefore be safer for use around children. (*See* March, 1990 Report by Yellowstone Environmental Science for BIC Corp. entitled "Cognitive Type Child Resistant Lighter"), Ex. R to Nelson Dec. (noting that safety criteria for lighters may include obscuring or minimizing lighter features that are attractive to children, for example color); 9/86 Consumer Product Safety Alert, Ex. M to Nelson Dec. (attachment to the ASTM Minutes (listing as present Alex Alexiades, BIC Corp.))(warning parents to keep their young children away from lighters because their color and small size makes them fascinating to children); 5/4/86 BIC Inter-Company Memorandum to Norman Yeo Re: Child–Resistant Lighters ("1986 BIC Internal Mem."), Ex. L to Nelson Dec. at 1–2 (stating that "requirements that can be met" include "dull colors"); 1/28/86 Letter from Citizens' Committee for Fire Protection to the CPSC, Ex. K to Nelson Dec. (stating that "children no doubt find the colorful plastic lighters more attractive playthings" and requesting that the CPSC develop child-safety standards for lighters). However, none of these reports contain any data or other evidence that brightly colored lighters are in fact more

---

**30.** It is likely that BIC only tested children age five and under. However, plaintiffs' design defect claim is not that the product is unreasonably dangerous because children of *any age* are able to remove the safety feature. Their claim is that the lighter design was defective because Josue was able to remove the latch from a properly manufactured lighter. *See* Pl. Mem. at 19. The lack of admissible evidence to support this proposition, assuming a properly manufactured product, compels the conclusion that no reasonable juror could find for plaintiffs on this issue.

attractive to children. Moreover, the remaining reports plaintiffs offer recommend that the child safety feature itself not stand in contrast with the color of the lighter, but rather be made to blend in with the color of the lighter body. *See* 4/1/86 Report by Arthur Little for BIC Corp. ("Little Report"), Ex. J to Nelson Dec. at 8 (suggesting the BIC use dull or non-contrasting color for any safety switches or mechanisms); 6/16/88 Letter from Dr. Martin Glasser to Theta Resources, Consultant Engaged by BIC, Appendix to Ex. P to Nelson Dec. at 1–2 (recommending that "the color of the safety latch [ ] match the case").[31] On the basis of this scant evidence, no reasonable jury could find that bright color and small size pose a "substantial risk of harm" to children. *See supra* Part IV.C (outlining the test for defect).

Even if plaintiffs have raised a triable issue with respect to whether the BIC lighter's bright color creates a substantial risk of harm, plaintiffs have failed to adduce evidence under the second and third prongs of the test for design defect— the availability of a safer alternative design, and proximate cause.

Plaintiffs have not adduced sufficient evidence in support of the second prong of the test for design defect, feasible and safer alternative design.[32] It is obvious that the cost of making lighters in a different color would be negligible. However, cost is only part of the test. Plaintiffs have presented very weak evidence that dull colors may be safer, consisting mainly of recommendations lacking any empirical basis.

Nor do plaintiffs present evidence on the third prong of the test, proximate cause. Plaintiffs have not attempted to show that the "candy apple-red" color of the subject lighter was a significant factor in Josue's playing with the lighter or that Josue was initially attracted to this lighter because of its color. Indeed, the fact that Josue had experience in using a "utility lighter" makes it even less likely that it was the bright red color of the lighter that attracted him. 1/04/01 Nelson Rpt. at 3 (reporting on 12/27/00 interview of Molina who said that she had discovered her child lighting a utility lighter two to three weeks before the accident). Similarly, plaintiffs offer no evidence that bright color, as opposed to a desire to imitate the adults around them or a fascination with a lighter's flame, is what attracts children to lighters.

Without evidence that brightly-colored lighters pose a substantial likelihood of harm, that dull-colored lighters present a safer alternative, or that the bright-color design of the subject lighter was a substantial cause of Josue's injury, plaintiffs' design defect claim based on color fails as a matter of law. Accordingly, BIC's mo-

31. BIC accepted these recommendations by designing and producing the red J–15 model lighter with a red safety feature. *See* Adams Aff. at 3; Adams Rpt. at 2; *see also* BIC Website Postings (annoyed user referring to "red" "safety feature"). This is the basis of BIC's defense that the lighter Josue used to injure himself was not the subject lighter. *See supra* note 1 (mentioning identification defense).

32. Again, the first two prongs, when combined, require the balancing of risk, utility and cost. *See Anderson*, 76 F.Supp.2d at 454–55 (citing *Voss*, 59 N.Y.2d at 107, 463 N.Y.S.2d 398, 450 N.E.2d 204). Plaintiffs have made an insufficient showing that (1) bright color presents a risk to children, and no showing at all (2) that the risk of bright color outweighs the utility of using a bright color compared to the risk versus utility of using a dull color. *See supra* note 9 (discussing possible countervailing dangers inherent in manufacturing lighters in dull, matte colors).

tion for summary judgment as to this claim is granted.

## 2. Failure to Warn Claim

 It is not entirely clear what plaintiffs claim as BIC's failure to warn. There are three possibilities: *One*, BIC failed to warn Ms. Rivera, the intended user, that, in general, lighters should be kept away from children. *Two*, BIC failed to warn Ms. Rivera that the lighter would still be operable with the safety guard removed and that a lighter with no safety guard presents a danger to children. *Three*, BIC failed to warn Ms. Rivera that children could remove the safety guard of the lighter and operate it without the safety guard. In order to survive summary judgment on their failure to warn claim, plaintiffs must present evidence that the lack of an adequate warning was both a defect posing a likelihood of substantial harm, and the proximate cause of Josue's injury.

The J–15 lighter normally carries a peelable warning label: "Keep Away from Children." *See supra* Part I.B. Because that label was easily removable and had been removed from the subject lighter, *see id.*, plaintiffs maintain that BIC should have designed the lighter with a permanent non-removable warning. *See* 2/23/01 Plaintiffs' Response to Defendant's Demand for Interrogatories ("2/23/01 Pl. Interrog.") No. 39, at 22. Plaintiffs do not contend, nor would it be a viable contention, that BIC failed to warn Josue, the child plaintiff, of any of the dangers listed above. *See* M. Stuart Madden, *Products Liability, Products for Use by Adults and Injured Children*, 61 Tenn. L.Rev. 1205, 1212 (1994)(indicating that in failure to warn claims involving children's misuse of adult products, the proper focus is on the warning given to the responsible adult).

 To the extent plaintiffs claim that BIC failed to warn Ms. Rivera that lighters must be kept away from children, defendant's motion for summary judgment is granted because the open and obvious exception bars this claim. *See Liriano*, 92 N.Y.2d at 241, 677 N.Y.S.2d 764, 700 N.E.2d 303; *Hutton*, 158 F.Supp.2d at 376. Courts treat as obvious a danger that would ordinarily be seen and appreciated by those who would be expected to use the product. *See Liriano*, 92 N.Y.2d at 241–42, 677 N.Y.S.2d 764, 700 N.E.2d 303 (citing Prosser & Keeton, Torts § 96, at 686–687 (5th ed.)).[33] Where a danger is readily apparent as a matter of common sense, "there should be no liability for failing to warn someone of *a risk or hazard which he [or she] appreciated to the same extent as a warning would have provided.*" *Liriano*, 92 N.Y.2d at 242, 677 N.Y.S.2d 764, 700 N.E.2d 303 (emphasis added); *Hutton* ("[I]f the plaintiff's testimony shows that he or she was aware of the danger to the extent that a warning cannot increase his awareness of its presence, and the warning would not have prevented the harm, a failure to warn cannot be the proximate cause."). Here, Ms. Rivera testified that she often babysat children, always kept her lighter on a high shelf, frequently warned the children she babysits of the danger involved in playing with lighters, and specifically warned Josue two to three

---

**33.** The open and obvious exception is often used with respect to "simple tools" that are used in the home and misused by children to injure themselves. *See generally* Madden, at 1210 (listing pencils, pins, needles, knives, razor blades, nails, bottles and other objects made of glass as "simple tools" whose danger is open and obvious). Madden notes that while the simple tools doctrine was used for many years to preclude manufacturer liability for injuries caused by children playing with lighters, the doctrine was lifted in most jurisdictions to require the manufacture and sale of lighters with child-safety features. *See id.* at 1219–1221.

times prior to the accident not to play with lighters because it was very dangerous and he might burn himself. *See* Rivera Dep. at 36, 38–41. The only conclusion that can be drawn from these facts is that if Ms. Rivera had read the warning "Keep Away From Children," this would not have added to *her* appreciation of the danger. *See Liriano,* 92 N.Y.2d at 242, 677 N.Y.S.2d 764, 700 N.E.2d 303 ("Where only one conclusion can be drawn from the established facts, the issue of whether the risk was open and obvious may be decided by the court as a matter of law."); *see also id.* at 241, 677 N.Y.S.2d 764, 700 N.E.2d 303 ("[C]ourts [can] as a matter of law decide that a manufacturer's warning would have been superfluous given an injured party's actual knowledge of the specific hazard that caused the injury.").

 To the extent that plaintiffs claim that BIC failed to warn Ms. Rivera about the dangers associated with removal of the safety feature, this claim is denied as a matter of law because such failure to warn was not the proximate cause of Josue's accident. Under New York law, a claimant must adduce evidence showing that "a failure to warn was a substantial factor in causing [plaintiff's] injury." *Hutton,* 158 F.Supp.2d at 375 (holding that plaintiff's failure to warn claim was precluded under New York law because failure to warn not proximate cause of injury). Ms. Rivera testified that she did not remove the safety feature. *See* Rivera Dep. at 63. Thus, BIC's failure to provide a warning that "The Lighter Will Still Operate Even With Child Guard Removed"— would not have changed her behavior. It

follows that the failure to warn was not the proximate cause of Josue's injuries. If Ms. Rivera *had* removed the safety feature, only then might BIC's failure to warn the customer that the lighter works even when the safety feature has been removed have been a proximate cause of Josue's injury.[34]

 Finally, if plaintiffs claim that BIC failed to warn them about the risk that a child could remove the safety feature, this too fails as a matter of law. Under New York law, a manufacturer has a duty to warn against latent dangers resulting from foreseeable intended and unintended uses of its product of which it knew or should have known. *See Liriano,* 92 N.Y.2d at 237, 677 N.Y.S.2d 764, 700 N.E.2d 303 (citing cases). Assessing the evidence offered by plaintiffs on the issue of whether Josue removed the safety feature, the Court concludes that no reasonable jury could find that such use was "reasonably foreseeable." That children will attempt to play with lighters is a reasonably foreseeable unintended use— one that has been addressed in numerous opinions and that has resulted in the emergence of a duty on the part of the manufacturer to make lighters child-resistant. *See, e.g., Campbell,* 586 N.Y.S.2d at 873; *Bartholic v. Scripto–Tokai Corp.,* 140 F.Supp.2d 1098, 1116 (D.Colo.2000). However, plaintiffs offer no evidence that BIC should have been able to foresee that a *child* could remove the safety latch. Adults who tamper with the lighters must use force and skill to break off the latch, a process that often requires the use of pli-

---

**34.** This failure to warn claim would then fail under the open and obvious danger exception because, if Ms. Rivera removed the safety feature, she would know from her frequent operation of the lighter that it worked without a guard. Ms. Rivera testified that she was smoking at the rate of twenty cigarettes a day, and had smoked about eight cigarettes the day of the accident. *See* Rivera Dep. at 30. She further testified that she owned no other lighters at the time, nor did she have any other lighters in the house. *See id.* at 38, 61; Pl. 56.1 ¶ 2.

ers. *See* BIC Website Postings; *see also* 7/12/01 Report of Dr. Lawrence Broutman, Defendant's Expert ("Brout.Rpt.") at 2 (performing latch removal tests using a Quick Fix tool, a screwdriver and a pocket-knife, and concluding that the process of removal "requires a tool of sufficient size and strength [,] manual dexterity and a period of experimentation to complete."). Not one of the 5,000 children BIC tested was able to remove the latch. *See* Adams Rpt. at 4. ("During the course of testing over 5,000 children [using surrogate lighters that do not produce a flame but beep or light up when the child has overridden the safety feature], never has a child disabled any child-resistant device.").

Accordingly, plaintiffs' failure to warn claims must be dismissed as a matter of law.

### 3. Manufacturing Defect

■ To review, the elements of a manufacturing defect claim are (1) a defect (2) that caused the injury. The parties do not dispute that the lighter's safety feature was intact at the time Ms. Rivera purchased the lighter, nor do they dispute that the feature had been removed by the time Josue used it to ignite his shirt. Plaintiffs do contest the conclusion that the feature had already been removed by the time Josue seized the lighter, and offer some evidence supporting the conclusion that Josue might have been the one to remove the child-resistant latch.

The evidence to the contrary, relied on by defendant, is highly persuasive. Of the five thousand children BIC tested, not one was able to remove the safety feature. *See* Adams Rpt. at 4. Evidence showing that smokers have developed a device to remove the safety feature on the lighter, the "Quick Fix," indicates that it is not possible to remove the safety feature without technical know-how, a good pair of

pliers, and adult motor skills. *See* BIC Website Postings; Adams Dep. at 98–99 (admitting that BIC was aware of the Quick Fix tool, and had in fact purchased some for testing purposes). Further, Labrum examined the subject lighter under a microscope and concluded that "the latch, latch spring, fork, body and other components of the lighter were properly manufactured." Labrum Rpt. at 3. Labrum also opined that "there is no support for the claim that the lighter in this case possessed a latch which was easily removed by a child in three minutes or less." *Id.* Rather, Labrum observed tool marks indicating that "significant force was necessary to remove the latch from the lighter," and debris in the body cavity of the lighter, which indicated that the latch had been removed early on in use (and not on the date of the accident by Josue). *Id.*

Nevertheless, plaintiffs present enough evidence to raise an issue of fact as to whether Josue himself removed the safety feature or it just fell off. *First*, Ms. Rivera swears that she did not remove the safety feature or lend the lighter to anyone else. *See* Rivera Dep. at 64; Pl. 56.1 ¶ 9. *Second*, Ms. Rivera testified that Josue and his brother were only in the bathroom for a few minutes before the accident occurred, not allowing Josue enough time to experiment with a tool and forcibly remove the latch. *See id.* at 45, 50, 70. *Third*, Nelson observed no marks, scratches or nicks on the lighter, and concluded that no concentrated effort was made to remove the safety feature by force. *See* 1/12/01 Nelson Rpt. at 4. From this evidence, a jury might reasonably conclude that the subject lighter was a lemon and the safety latch just fell out or was otherwise removable with the slightest tug. Perhaps the plastic in the latch or lighter body was weak or broken; perhaps the safety latch was not actually attached; perhaps there

was some other mistake in production. Because all of these explanations are reasonably plausible, plaintiffs have adduced sufficient evidence to prove that an easily removable safety latch posed a substantial risk of harm.[35]

Plaintiffs also satisfy the second and remaining prong for manufacturing defect: proximate cause. Were the latch not easily removable, or had it not simply fallen off, Josue would probably not have been injured. It is possible that Josue knew how to override the safety feature without removing it, given his experience with a utility lighter. Plaintiffs' evidence that the subject lighter's latch came off easily, however, raises a genuine issue of fact as to whether a manufacturing defect was a "substantial factor" in bringing about Josue's injury.

Defendant's motion for summary judgment is therefore denied as to plaintiffs' manufacturing defect claim.

## V. BREACH OF WARRANTY CLAIMS

Defendant also moves for summary judgment on plaintiffs' claims for breach of express and implied warranty. In New York, products are sold with an implied warranty of fitness that the product is "fit for the ordinary purposes for which such goods are used." *Denny*, 87 N.Y.2d at 258, 639 N.Y.S.2d 250, 662 N.E.2d 730 (citing section 2–314(2)(c) of the Uniform Commercial Code and noting its "continued vitality in New York"). This warranty "provides for a minimal lev-

el of quality." *Denny*, 87 N.Y.2d at 258, 639 N.Y.S.2d 250, 662 N.E.2d 730 (citing *Skelton v. General Motors Corp.*, 500 F.Supp. 1181, 1191 (N.D.Ill.1980), *rev'd on other grounds*, 660 F.2d 311 (7th Cir. 1981)). No showing of privity is required in a personal injury action for breach of express or implied warranty. *See Cereo v. Takigawa Kogyo Co.*, 252 A.D.2d 963, 676 N.Y.S.2d 364, 365 (4th Dep't 1998)(citing UCC § 2–318).

In this case, plaintiffs allege that Ms. Rivera bought the subject lighter because it was child-resistant. *See* Rivera Dep. at 57. If the lighter's child-safety latch fell off or was removable by a young child, the product did not perform to specifications or provide a minimum level of child-resistance.[36] Thus, a jury may find BIC liable for breach of either express or implied warranty.

Therefore, BIC's motion for summary judgment on these claims is denied.

## VI. PLAINTIFFS' MOTIONS IN LIMINE

### A. Motion to Exclude Evidence of Infant Plaintiff's Conduct or Activity

Plaintiffs move to exclude all evidence of Josue's prior conduct and activity on the grounds that it is improper character evidence. They also move to preclude any evidence of any physical disability resulting from plaintiff's condition of Attention Deficit Disorder ("ADD").

---

**35.** Contrary to BIC's assertion, its substantial modification defense is inapplicable to this claim. The substantial modification defense bars liability where a third party removed a safety feature thus rendering the product unsafe. *See* Part IV.D.1.a (discussing substantial modification defense). It is a matter of common sense that this defense does not apply where a child is the one who modifies the

product by removing the safety feature designed to protect him.

**36.** This assumes that plaintiffs can meet their burden of proving that defendant provided express and implied warranties. The parties did not brief the warranty issue in their motion papers.

Relevant evidence is admissible, and irrelevant evidence is not admissible. *See* Fed.R.Evid. 401. Josue's prior conduct is irrelevant to the disputed issue—whether the subject lighter had a manufacturing defect permitting the easy removal of the safety latch. If the lighter was indeed defectively assembled or produced so that the latch fell off with jiggling or light tugging, a child with a propensity to play with lighters would have no advantage over a child with no prior knowledge of lighters. BIC does not argue otherwise. Similarly, the allegation that Josue's hand tremors resulting from ADD would have made it impossible for him to remove the safety feature of the lighter, *see* Def. Opp'n. at 13–14, is not relevant to a determination as to whether the safety latch was so defective that it just fell off. Therefore, plaintiffs' in limine motion to exclude evidence of Josue's prior conduct and physical disability is granted.

### B. Plaintiffs' Motion to Exclude Defendant's Experts

Plaintiffs move to exclude Eric Peterson and Lawrence Broutman on the ground that the evidence they offer is cumulative of that offered by Adams and Labrum, and seek to exclude Peterson on the additional ground that his testimony offers improper legal opinions.[37]

### 1. Legal Standard

 Rule 403 excludes relevant evidence where its probative value is "substantially outweighed" by considerations of, *inter alia,* "needless presentation of cumulative evidence." Fed.R.Civ.P. 403. A district judge has discretion to exclude evidence if it is cumulative of evidence already in the record. *See International Minerals & Res., S.A. v. Pappas,* 96 F.3d

586, 596 (2d Cir.1996) (citing *United States v. Holmes,* 44 F.3d 1150, 1157 (2d Cir.1995) ("Absent a clear abuse of discretion, a trial judge retains a wide latitude to exclude irrelevant, repetitive, or cumulative evidence.")). Expert testimony presents no exception to this general rule. *See F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1258 (2d Cir.1987). Further, it is well-settled that experts are prohibited from testifying as to the content or application of the law. *See United States v. Duncan,* 42 F.3d 97, 103 (2d Cir.1994); *In re IPO Litig.,* 174 F.Supp.2d 61, 63–68 (S.D.N.Y.2001).

### 2. Discussion

 Plaintiffs seek to preclude testimony from Dr. Lawrence Broutman on the ground that his testimony is cumulative. BIC retained Broutman as an outside expert to test the subject lighter in order to determine when the latch had been removed. *See* 9/27/01 Defendant's Opposition to Plaintiffs' Pre–Trial Evidentiary Motions ("Def.Opp'n.") at 5. Broutman reached the same conclusions, but conducted different tests than Adams or Labrum. *See* Adams Rpt. at 2 (concluding from the "body deformation" of the lighter that latch had been forcibly removed); Labrum Rpt. at 2–3 (concluding that the latch had been forcibly removed some time before the accident because of the accumulation of flint dust and debris in latch cavity, little fuel left and deformation of lighter); Labrum Rpt. at 4 (concluding from gouge marks and pocket debris that latch had been forcibly removed).

Unlike either Adams or Labrum, Broutman disassembled two exemplar lighters, removed their safety latches, and tested them to determine the physical effect that

---

**37.** They argue that Peterson's testimony is irrelevant in light of *Colon I,* which held that

the relevant regulation is merely a minimum safety standard for disposable lighters.

operation without the safety latch would have on various components of the exemplars. *See* Broutman Rpt. at 2–3 (pages unnumbered). Broutman also performed latch removal tests using various tools, including the infamous Quick Fix device, to determine the amount of force required to remove the latch entirely. *See id.* at 3–4, Table 1. In addition, Broutman x-rayed the lighter to measure the flint length, then compared the flint length to a chart developed for BIC lighters to determine the approximate number of strikes the subject lighter had received prior to the accident. *See id.* at 2. As described above, Broutman's testimony is relevant to the issues of when and how the latch was removed, and the condition of a normal, functioning unit. Because neither Labrum nor Adams performed any of the tests Broutman conducted, Broutman's testimony is not cumulative.

■ Plaintiffs contend that Peterson's testimony that the J–15 mini-lighter met the requirements of 16 C.F.R. § 1210, the CPSC regulation prescribing minimum safety standards for child-resistance of disposable lighters, is cumulative. Both Adams and Labrum are prepared to testify that BIC complied with these regulations. *See* Adams Rpt. at 3 ("The BIC J–15 model lighter met or exceeded the requirements of the CPSC regulation for cigarette lighters."); Labrum Rpt. at 3 ("[BIC] met or exceeded all applicable industry standards, including but not limited to ASTM Standard F400–92 and 16 C.F.R. 1210."). Therefore, Peterson's testimony is cumulative on this point.

■ Plaintiffs contend further that any evidence of compliance with the relevant regulations is irrelevant given this Court's decision in *Colon I,* 136 F.Supp.2d at 208, which stated that "it is difficult to construe these regulations as anything but a mandatory minimum standard with which all manufacturers or importers must comply." However, *Colon I* also noted that "compliance with the federal statute and/or regulations may constitute evidence that BIC exercised due care." *Id.* at 208 n. 17 (citing *Hamilton v. Accu-Tek,* 935 F.Supp. 1307, 1321 (E.D.N.Y.1996)).[38] Because the only remaining claim is manufacturing defect, Peterson's testimony, including evidence of compliance with the federal regulation, is not relevant to a determination of whether this lighter had a manufacturing defect.[39] Therefore, Peterson's testimony is excluded. *See* Fed.R.Evid. 401.

## VII. DEFENDANT'S OTHER MOTIONS IN LIMINE

### A. Motion to Bifurcate

Rule 42 provides that a court may, "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy," order separate trials of any number of "is-

---

**38.** The CPSC acknowledges that the child-safety regulation is most effective at reducing fires started by young children under age five. *See* 16 C.F.R. § 1210.5(a). In *Colon I,* I referred to this fact as support for my decision that the regulations did not preempt state tort law. *Colon I,* 136 F.Supp.2d at 209 n. 16. On the other hand, Josue's age and the age range targeted in the regulation are sufficiently similar that compliance with this standard is relevant to a determination of whether a manufacturer acted reasonably in designing the product.

**39.** BIC contends that "Eric Peterson is the most qualified non-BIC employee to educate the jury on the industry standards for a disposable lighter." Def. Opp'n. at 11. However, experts may not instruct the jury on the law. *See Duncan,* 42 F.3d at 103; *In re IPO Litig.,* 174 F.Supp.2d at 63–69. Therefore, Peterson may not testify on the development and content of the applicable regulations.

sues." Fed.R.Civ.P. 42(b); *see also Vichare v. AMBAC, Inc.,* 106 F.3d 457, (2d Cir.1996) (stating that bifurcation is appropriate where it will serve convenience, negation of prejudice and judicial efficiency); *Union Carbide Corp. v. Montell N.V.,* 28 F.Supp.2d 833 (S.D.N.Y.1998) (identifying factors to consider in deciding whether to bifurcate including risk of prejudice, likelihood that bifurcation would enhance juror comprehension, likelihood that bifurcation would save or waste resources and the potential that remaining issues may be resolved by motion or settlement).

■■■ Here, separation of the issues of liability from damages will avoid undue prejudice and increase efficiency. Plaintiffs intend to introduce evidence of Josue's disfiguring burns, which may arouse juror sympathy and frustrate the jury's deliberation on complex factual issues regarding the design or manufacture of the subject lighter. Further, the issues of liability and damage are not inextricably intertwined such that they must be tried together. To the contrary, a separate trial for liability may obviate a damages trial, thus conserving judicial resources. *See Vichare,* 106 F.3d at 466 (bifurcation appropriate where litigation on one issue may obviate need to try second issue). In sum, BIC has satisfied its burden of demonstrating that bifurcation is warranted. *See Dallas v. Goldberg,* 143 F.Supp.2d 312, 315 (S.D.N.Y.2001) (stating that the party seeking bifurcation has the burden of proving that it is warranted).

### B. Motion to Exclude and Limit Photographs at Trial, and to Exclude Video

Plaintiffs seek to introduce 102 photographs of Josue's injuries taken at the Shriner Hospital as well as a "day in the life" video of Josue in the hospital. Defendant moves pursuant to Rule 403(1) to

limit the number of photographs plaintiffs may present at trial; (2) to exclude graphic photographs, and (3) for in camera review of all photographs prior to trial. BIC also requests that the Court exclude the video on the ground that it is highly prejudicial to BIC and unfairly represents Josue's condition. In response, plaintiffs urge the Court to defer any ruling on these photographs until trial. *See* Plaintiffs' Opposition to BIC's Motion for Bifurcation ("Pl.Opp'n.") at 5 (citing *United States v. Chrysler,* No. 96 Cr. 134, 1996 WL 377078, at *7 (N.D.N.Y. July 5, 1996) ("Defendant's motion to suppress the introduction of any such evidence is premature. It is only when the contested evidence is actually sought to be introduced that the court can conduct the Rule 403 balancing . . . ."); *In re Air Crash Disaster at Sioux City,* No. 89 Civ. 8082, 1991 WL 279286, at *3 (N.D.Ill.Dec.26, 1991) ("McDonnell Douglas' concerns are best addressed in the context of trial and, more critically, in relation to specifically identified photographs that plaintiffs might offer into evidence.")).

■■ This issue will be decided at a pretrial hearing where the Court can conduct a Rule 403 balancing in response to BIC's renewed objections to the photographs. *See Chrysler,* 1996 WL 377708, at *7. However, there is no question that plaintiffs will be permitted to introduce at least some of the graphic photographs. "Still photographs, motion pictures, and videotapes, once properly authenticated, are admissible in evidence if helpful to the trier of fact's understanding of a fact of consequence in the litigation." Michael H. Graham, 1 *Handbook of Fed. Evid.* § 401.7 (5th ed.2000). The decision whether to admit graphic or gruesome pictorial representations of plaintiff's injuries lies within the discretion of the Court. *See Martin v. Maintenance Co.,* 588 F.2d 355 (2d Cir.

1978); *Whelan v. Penn Central Co.*, 503 F.2d 886 (2d Cir.1974). Relevant photographic evidence may, however, be excluded pursuant to Rule 403 if its prejudicial effect outweighs its probative value. *See Handbook of Fed. Evid.* § 401.7. Here, the graphic nature of the photographs will have limited prejudicial effect because they will not be introduced during the liability phase of the trial. *See* Pl. Opp'n. at 8 (citing *Vichare*, 106 F.3d at 466) ("The interests served by bifurcated trials [include the] negation of prejudice.").

■ In its motion to exclude the day-in-the-life video, ·BIC contends that the video unfairly represents Josue's hospital stay because it depicts his mother beside him. *See Bannister v. Town of Noble*, 812 F.2d 1265, 1269 (10th Cir.1987) (holding that a film depicting the victim in unlikely circumstances cannot be said to fairly portray a typical "day in the life" of the victim). BIC presents evidence indicating that Molina only infrequently visited her son in the hospital, *see* Def. Photo. Mem. at 8 (referring to Worcester Youth Guidance Center's filing of a formal complaint due to Molina's neglect and absence while her son was hospitalized, and to the interview with Lisa McCurry, M.D., who recorded Josue as saying that he was feeling sad due to his mother's absence and recorded that mother did not return phone calls), and that the video was made for purposes of litigation, not for treatment, *see BD v. DeBuono*, 193 F.R.D. 117, 135 (S.D.N.Y.2000) (noting that the video in issue was made not for purposes of litigation but for assessing the treatment of plaintiffs).

The videotape will be admitted so that the jury can observe Josue's condition after the accident, observe the way treatment is and was administered, and allow the jury to view the child's progress. *See BD*, 193 F.R.D. at 135–36. I will reserve decision, pending in camera review, as to the sound component of the video.

## C. Motion to Exclude Evidence of Claims, Accidents, and Intra–Company Inspection Reports

■ BIC seeks "an order precluding plaintiffs from referring to or introducing testimony or evidence regarding claims, lawsuits and intra-company return memoranda including inspection reports and field audits, which discuss accidents or injuries allegedly caused by or involving BIC disposable lighters." Motion for an Order Precluding Admission of Prior Claims, [Etc.] ("Def. Prior Claim Mot.") at 1. BIC requests that the Court hold an in camera hearing to address the admissibility of each of the claims, lawsuits, and return memoranda plaintiffs plan to introduce or refer to at trial. *See id.* at 6. BIC seeks to exclude such evidence because (1) it contends that plaintiffs will be unable to establish the substantial similarity of any accidents or claims to the case at bar; (2) the probative value of any claims or reports is outweighed by prejudice and the potential to delay the trial and confuse and mislead the jury; and (3) because the documents are inadmissible hearsay. BIC contends that, were the Court to admit these documents, BIC would have to review each report or claim with the jury— which would create many trials within a trial.

Generally, intra-company reports constitute party admissions admissible under Rule 803(6) of the Federal Rules of Evidence, and may be relevant to a determination of either manufacturing defect or BIC's faulty designs. Evidence of prior accidents with substantially similar circumstances may be admissible to show manufacturing defects. An evidentiary hearing is required to determine whether or to what extent to admit these documents.

## VIII. CLAIM FOR EMOTIONAL DISTRESS AND LOSS OF SUPPORT

Josue's mother seeks damages for the emotional trauma she experienced in seeing Josue's burn injuries for the first time, and for the permanent psychological damage BIC's alleged misconduct caused her. Defendants move to dismiss Iris Molina's claim for emotional or psychiatric injuries because she was not in the zone of danger, and her claim for loss of support as duplicative of any future earnings award to Josue.

### A. Legal Standard

■ New York recognizes the right to recover damages for emotional injury where defendant's conduct created an unreasonable risk of injury to plaintiff, and where plaintiff contemporaneously observed the injury or death inflicted by the defendant on a member of plaintiff's immediate family. *See Bovsun v. Sanperi et al.,* 61 N.Y.2d 219, 230–31, 473 N.Y.S.2d 357, 461 N.E.2d 843 (1984) (establishing the "zone of danger" rule in New York); *Feng v. Metropolitan Trans. Auth.,* 285 A.D.2d 447, 727 N.Y.S.2d 470, 471 (2d Dep't 2001) (applying *Bovsun* ).

■ To recover damages for emotional injury, plaintiff herself must have been in danger of bodily harm because of defendant's misconduct. *See Feng,* 727 N.Y.S.2d at 471 (dismissing claim for emotional distress brought by mother of man struck by moving train and thrown onto his mother, because mother did not see train coming and was not herself in danger of being hit by the train). New York also recognizes a parent's right to recovery for loss of a child's pecuniary support. *See* Gen. Oblig. § 11–101. Absent a showing that a child had a legal duty to support his parents or had undertaken an obligation to do, however, a parent cannot recover damages for loss of support. *See id.; McNeill v. Rugby Joe's, Inc.,* 272 A.D.2d 384, 707 N.Y.S.2d 483, 484 (2d Dep't 2000) (holding that parents could not recover loss of support damages where deceased son had neither a legal duty to support his parents nor had undertaken such an obligation).

### B. Discussion

■ Iris Molina's claim for emotional distress is excluded because no action of defendant put her at physical risk. *See Bovsun,* 61 N.Y.2d at 231, 473 N.Y.S.2d 357, 461 N.E.2d 843; *Feng,* 727 N.Y.S.2d at 471. Josue's injury occurred in Massachusetts while Molina was in New York. There is no recovery under New York law for the trauma a parent experiences upon observing, and living with, the effects of a child's injuries.

■ Molina's claim for loss of Josue's future earnings is also dismissed as duplicative of any future earnings award to Josue. Were Josue to undertake an obligation to support his mother, he would pay such support from his future earnings. Any future earnings the jury awards to Josue, therefore, will be inclusive of pecuniary support to Molina.

## IX. CONCLUSION

Defendant's motion for summary judgment is granted as to plaintiffs' design defect claims including failure to warn, but denied as to their manufacturing defect claim.

SO ORDERED: